# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1100
_____

United States of America,

Appellee,

v.

Michael Jerome Zimmer,

Appellant.

_____

No. 01-1502
_____

United States of America,

Appellee,

v.

James Clarence Stoltz,

Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\* Appeals from the United States
\* District Court for the
\* District of Minnesota.
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 01-1506

_____

United States of America,

            Appellee,

      v.

Aaron Dale Carver,

            Appellant.

 

 

_____

Submitted: October 16, 2001
Filed: July 25, 2002

_____

Before MCMILLIAN, BEAM, and HANSEN,[1] Circuit Judges.

_____

HANSEN, Circuit Judge.

The appellants in this case are three of seventeen persons indicted for activity arising out of and relating to a methamphetamine manufacturing ring operating primarily out of Princeton, Minnesota. In the case of these particular defendants, the government filed a two-count indictment charging Aaron Carver, Sean Chandler,

_____

[1]The author of this opinion became Chief Judge of the United States Court of Appeals for the Eighth Circuit on February 1, 2002.

2

James Stoltz, Kurt Sandberg, and Andre Baumgartner with conspiracy to manufacture, distribute, and possess with intent to distribute methamphetamine from October 1996 through March 1998. The second count charged Carver with being a felon in possession of a firearm. Chandler and Sandberg pleaded guilty to the first count and agreed to testify in the government's case against the remaining defendants. The government then filed a superseding indictment recharging Carver, Stoltz, and Baumgartner, and adding Michael Zimmer and David May as defendants. Baumgartner and May pleaded guilty to the conspiracy charge and testified in the government's case against the remaining defendants.

After a jury trial, Zimmer and Stoltz were convicted of conspiring to manufacture, distribute, and possess with intent to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1). Carver was convicted of conspiracy to manufacture, distribute, and possess with intent to distribute methamphetamine and of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On appeal, Stoltz raises numerous challenges to both his conviction and his sentence. Zimmer and Carver challenge their sentences but not their convictions. We affirm the judgments of the district court.[2]

I.

Zimmer and Carver met in 1996 when they both were incarcerated at the same facility in the State of Washington. Zimmer learned that Carver was skilled in using the red phosphorous method of manufacturing methamphetamine and recognized that he could use Carver's skill to make some money. Zimmer contacted his long-time friend, James Stoltz, who at that time owned a concrete business in Princeton, Minnesota, and told him about Carver's skill. Zimmer suggested that Stoltz pay for

_____

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

3

Carver to move to Minnesota upon Carver's release from prison. The three men reached an agreement whereby Stoltz would pay for Carver to move to Minnesota, Stoltz would provide Carver a residence and a vehicle upon his arrival, Carver would manufacture and distribute methamphetamine, and the three men would then share the proceeds generated from their illegal activity. There was testimony at trial that Zimmer was to receive between ten and thirty percent of the proceeds for initiating and organizing the operation.

Carver was released from the Washington facility in August 1996 and traveled to Minnesota. As they had agreed, Stoltz provided Carver with a Pontiac Firebird and allowed Carver to stay in a trailer on Stoltz's property. Carver began to manufacture and distribute methamphetamine from Stoltz's trailer. He was the primary producer, or "cook," during the course of this operation. As the conspiracy progressed, others, many of whom had worked for Stoltz at one point or another, became involved, including May, Sandberg, Chandler, and Baumgartner. On one occasion, Carver and John Stoltz, James's brother, created an instructional videotape that others could watch to learn how to cook methamphetamine. The conspirators continued to manufacture methamphetamine through March 1998.

Although Zimmer was incarcerated at the Washington State facility for some of the time during which the aforementioned activities were occurring, he and Carver and Stoltz maintained correspondence. Much of their communication was related to furthering the conspiracy. For example, Carver originally employed the red phosphorous method of cooking methamphetamine, which entailed combining ephedrine, phosphorous, iodine, and water over a heat source to catalyze the ingredients and produce methamphetamine. The conspirators later switched their manufacturing process after Stoltz received a letter from Zimmer describing the more productive "Nazi dope" or lithium method of producing methamphetamine. The lithium method also required the use of ephedrine or pseudoephedrine as a precursor drug but substituted lithium and anhydrous ammonia for phosphorous and iodine as

4

reactive agents. At the time Zimmer sent the recipe, the lithium method of creating methamphetamine was little used in the Midwest, existing primarily on the west coast. The lithium method permitted the group to produce more final product than the red phosphorous method given the same amount of precursor drugs, i.e., the lithium method was a more efficient process that allowed the organization to increase production.

On March 3, 1997, a Princeton police officer on routine patrol observed Carver's vehicle near a storage unit in an industrial park. The officer noticed that the vehicle had a broken taillight. The officer trailed Carver and attempted to pull him over after he failed to stop at a stop sign. Carver sped away, and a high speed chase ensued–lasting almost thirty minutes and reaching speeds of over one hundred miles per hour. The chase ended when Carver lost control of his vehicle and drove his car into a ditch. The officers arrested Carver and searched his vehicle. Inside the vehicle, the officers found the shell of a lithium battery, other methamphetamine manufacturing paraphernalia, an electronic scale covered with methamphetamine residue, and one spent and one live round of 9 millimeter ammunition. Carver was charged by the State of Minnesota with possession of methamphetamine but was released on $10,000 cash bail, $5000 of which Stoltz paid. Carver then temporarily fled Minnesota and failed to appear for any further court appearances relating to the state drug charges.

The police continued their investigation and obtained a search warrant for the storage unit where the officer had first observed Carver. They seized numerous items consistent with methamphetamine production, a Mossberg Model 500A 12-gauge shotgun with pistol grip, and a Cobray Model Mac 11- 9 millimeter assault pistol. The police also seized Western Union money order receipts, a box containing correspondence between Zimmer and Carver, and the instructional videotapes made by Carver and John Stoltz. One of the letters from Zimmer to Carver read, "Write and let me know the latest adventures of Jim [Stoltz] and Aaron [Carver] enterprises."

5

The officers continued to follow leads, and they obtained the consent of Carver's girlfriend to search her car. Inside her vehicle the police found several photographs of Carver holding various weapons, including a Cobray Model Mac 11-9 millimeter assault pistol.

On March 7, 1997, officers executed a search warrant at the trailer in which Stoltz allowed Carver to live. Most of the furniture and evidence that the officers had expected to find was missing, and the trailer was largely empty. Stoltz had been forewarned of the impending search, and he had contacted Baumgartner and asked him to remove everything from the trailer before the police arrived. Baumgartner complied. He and two others went to the trailer in the middle of the night before the police arrived and removed the furniture, a gun safe, and any evidence of methamphetamine manufacturing. The officers did discover, however, a trap door in the front bedroom which led to a hand-dug hole approximately nine feet by nine feet by seven feet deep lined with plastic. In the hole the officers found plant containers, a grow light, plant food, and lithium battery casings.

Later, during the summer, the Mille Lacs County Sheriff's office received an anonymous telephone call stating that Carver had recently been seen at Stoltz's residence. Because there was still a warrant out for Carver's arrest, officers were dispatched to Stoltz's residence to capture him. When they arrived at the Stoltz residence, Carver fled into the surrounding woods. The officers gave chase, but Carver managed to escape. While searching for Carver in the wooded area around Stoltz's residence, the officers discovered marijuana plants growing in five gallon buckets. The officers returned to the residence and questioned Stoltz. The officers then obtained and executed a search warrant at Stoltz's residence. They seized items consistent with narcotics trafficking and manufacturing methamphetamine, including one gallon of Toluene, three gallons of Toluol, three gallons of muriatic acid, ammonia, seven glass pipes containing trace amounts of methamphetamine, a marijuana cigarette, and twenty-two marijuana plants.

6

While Carver was on the run, his coconspirators continued to manufacture and distribute methamphetamine until he and the other members of the conspiracy were captured. On April 9, 1999, a confidential informant sighted Carver in Pierce County, Washington. Following a tip, the police found Carver at the residence of his cousin, Jerry Kohl. The authorities surrounded the residence, but Carver refused to emerge from the garage of the house. A SWAT team fired gas into the garage, hoping to force Carver from the building. Carver refused to be smoked out, however, and the SWAT team entered the building with a canine unit and forcibly arrested him. At the time of arrest, Carver possessed a live hand grenade, a loaded Ruger 9 millimeter semiautomatic firearm, methamphetamine, and a glass pipe used for smoking methamphetamine. Zimmer was arrested in Minnesota. He was released on a $25,000 unsecured bond and was ordered to appear for arraignment in February 2000. Zimmer failed to appear, and a bench warrant was issued for his arrest. Several months later, Zimmer was spotted in Wisconsin, near a campground, and the Polk County Sheriff's office organized a large manhunt to find him. Zimmer successfully evaded the authorities for a day and a half before the authorities finally arrested him.

II.

The appellants have raised several arguments on appeal. We address the arguments of each appellant in turn.

A. Michael Zimmer

The district court sentenced Zimmer on January 4, 2001. It determined that Zimmer was accountable for more than 1.5 but less than 5 kilograms of methamphetamine, supporting a base offense level of 34. U.S. Sentencing Guidelines Manual (USSG) § 2D1.1(c)(3) (Nov. 2000). The district court applied a four-level enhancement pursuant to USSG § 3B1.1(a), finding that Zimmer was an organizer or

leader of a criminal activity involving five or more persons, and also applied a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 because Zimmer failed to appear for a judicial proceeding. Thus, Zimmer's total adjusted base offense level amounted to 40. Based on Zimmer's criminal history category VI, the Guidelines provided a sentencing range of 360 months to life imprisonment. The district court sentenced Zimmer to 360 months imprisonment and 5 years supervised release. Zimmer raises four challenges to his sentence, which we address seriatim.

Zimmer argues that the district court should have applied the version of the Sentencing Guidelines in effect when the conspiracy began and not the more punitive Sentencing Guidelines–amended effective November 1997–in effect at the time of sentencing. He contends that the application of the later, amended version of the Guidelines violates the Ex Post Facto Clause of the Constitution. "This court has previously determined that the Sentencing Guidelines are subject to the ex post facto clause." United States v. Cooper, 35 F.3d 1248, 1250 (8th Cir. 1994), vacated by 514 U.S. 1094 (1995), reinstated by 63 F.3d 761 (8th Cir. 1995), cert. denied, 517 U.S. 1158 (1996). As a general rule, "the sentencing court should apply the Sentencing Guidelines in effect at the time of sentencing unless doing so is violative of the ex post facto clause." Id. at 1250. Such a violation occurs where the operative Guidelines at sentencing "produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed." United States v. Reetz, 18 F.3d 595, 598 (8th Cir. 1994). Zimmer has not shown that his sentence under the post-1997 Guidelines is harsher than the sentence he would have received had the earlier version of the Guidelines been applied. Assuming this is the case, however, we still find no violation of the Ex Post Facto Clause.

We have recognized "a distinction between the application of a particular version of the . . . Guidelines to offense conduct occurring exclusively before the effective date of that version" and the application of a particular version of the Guidelines to "an offense or offenses whose conduct occurs both before and after the

8

version's effective date." Cooper, 35 F.3d at 1251. "The former implicates the ex post facto clause, the latter does not." Id. Thus, as a general rule, where a defendant's offense conduct straddles an enactment, the enactment can be applied to the defendant without violating the Ex Post Facto Clause even when the enactment would result in a harsher sentence. See United States v. Warren, 149 F.3d 825, 827 (8th Cir. 1998) (holding that where a conspiracy straddles the enactment of a statute, then the court may sentence the defendant in accord with that statute without violating the Ex Post Facto Clause); United States v. Farmer, 73 F.3d 836, 841 (8th Cir.) ("A conspiracy begun before the effective date of a relevant statute, but continued after that date, may constitutionally be punished under that statute. Conspiracy is a continuing offense."), cert. denied, 518 U.S. 1028 (1996); United States v. Marks, 38 F.3d 1009, 1016 (8th Cir. 1994) ("[A]pplying the Sentencing Guidelines to a conspiracy that straddles the Sentencing Guidelines' effective date is not violative of the ex post facto clause. We have noted that with conspiracy and other continuing offenses it is the completion date of the offense that controls the use of the Sentencing Guidelines to be applied."), cert. denied, 514 U.S. 1067 (1995); United States v. Pregler, 925 F.2d 268, 269 (8th Cir. 1991) (holding that the application of the Guidelines themselves poses no ex post facto dilemma when applied to a defendant involved in a conspiracy "begun before the effective date of the Guidelines and continuing after the effective date of the Guidelines"). Zimmer was convicted of participating in a conspiracy which began in October 1996 and continued through March 1998. Because the jury convicted Zimmer of a conspiratorial offense which straddled the amendment of the Guidelines, we conclude that the district court did not err in applying the post-1997 Guidelines.

We reject Zimmer's argument that he had withdrawn from the conspiracy before the amended version of the Guidelines went into effect. Zimmer bears the burden of proving that he withdrew from the conspiracy. United States v. Granados, 962 F.2d 767, 773 (8th Cir. 1992). "[I]t is not easy to withdraw from a criminal conspiracy." United States v. Grimmett, 236 F.3d 452, 453 (8th Cir. 2001). Zimmer

must do more than demonstrate that he undertook no conspiratorial activity after the cut-off date; he must demonstrate that he took affirmative action to withdraw from the conspiracy either by making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators. Granados, 962 F.2d at 773; United States v. Askew, 958 F.2d 806, 812-13 (8th Cir. 1992). To make a clean breast of a conspiracy, the conspirator must "sever[] all ties to the conspiracy and its fruits, and act[] affirmatively to defeat the conspiracy by confessing to and cooperating with the authorities." Grimmett, 236 F.3d at 456. The "[m]ere cessation of activities is not enough," to establish withdrawal from a conspiracy. Granados, 962 F.2d at 773.

Zimmer presented no evidence at trial that he had taken affirmative action to defeat the conspiracy or that he had communicated his intent to withdraw to his coconspirators. On the contrary, the evidence showed, and the jury apparently believed, that after November 1997, Zimmer continued to be involved with the conspiracy. In January 1998, prison officials intercepted mail from Zimmer addressed to inmates containing pictures of Zimmer seated in his kitchen with his arms wrapped around the precursor materials needed to make methamphetamine. After arrest, Zimmer forgave Baumgartner's $10,000 debt to Stoltz in exchange for a car in anticipation that he would later receive $40,000 from Stoltz for his share of the drug proceeds. While incarcerated and awaiting trial, Zimmer attempted to cover up the conspiracy by propositioning another inmate to intimidate or eliminate two witnesses who were prepared to testify against him. In sum, we conclude that Zimmer did not withdraw from the conspiracy prior to the effective date of the 1997 amendments to the Sentencing Guidelines and that the district court did not violate the Ex Post Facto Clause by applying the later, amended Guidelines in effect at the time of sentencing.

Zimmer claims that the district court erred in failing to apply a two-level sentence reduction pursuant to USSG § 3B1.2 for playing only a minor role in the

offense instead of applying the four-level enhancement pursuant to USSG § 3B1.1 for acting as an organizer or leader of the conspiracy. The Sentencing Guidelines require that the defendant's offense level be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). "[T]he government bears the burden of proving, by a preponderance of the evidence, facts necessary to establish a defendant's role in the offense." United States v. Rodgers, 122 F.3d 1129, 1133 (8th Cir. 1997), cert. denied, 522 U.S. 1061 (1998). We review the district court's sentencing decision for clear error. Id.

We have broadly defined the terms "organizer" and "leader." United States v. Bahena, 223 F.3d 797, 804 (8th Cir. 2000), cert. denied, 531 U.S. 1181 (2001). The defendant need not be the organizer or leader of a criminal organization for the purposes of § 3B1.1, as there can be more than one organizer or leader of a criminal enterprise. Id. Nor is it necessary that the defendant "organized or led all of the other participants in the activity." Id. We have previously determined that a defendant who recruits accomplices and directs their activities is an organizer and leader of the criminal activity. Id. at 804-05; see also USSG § 3B1.1, comment. (n.4) (including the recruitment of accomplices as a relevant factor militating in favor of finding that a defendant is an "organizer" or "leader"). Zimmer organized the conspiracy and was the lever which set it into motion. It was Zimmer who recruited Carver and Stoltz. It was Zimmer who arranged for Carver to move to Minnesota and meet with Stoltz. It was Zimmer who brokered an arrangement whereby Stoltz would pay for Carver's travel to Minnesota and provide Carver with transportation and a residence. It was Zimmer who provided Carver and Stoltz with the lithium or "Nazi dope" recipe. It was Zimmer who claimed that he was entitled to thirty percent of the proceeds generated by this criminal enterprise. See USSG § 3B1.1, comment. (n.4) (including the claiming of a large share of the fruits of the crime as a factor militating in favor of finding that a defendant is an "organizer" or "leader"). We need not be worried that Zimmer did not exercise direct control over his coconspirators, for we have

11

previously held that such direct influence and control was not a prerequisite to finding that a defendant was an "organizer" or "leader" within the meaning of § 3B1.1. United States v. Thompson, 210 F.3d 855, 861 (8th Cir. 2000), cert. denied, 532 U.S. 996 (2001). Accordingly, we conclude that the enhancement is supported by sufficient evidence and that the district court did not err in finding that Zimmer was an "organizer" or "leader" of this criminal conspiracy.

Zimmer challenges the district court's finding of drug quantity. "The Guidelines permit a district court to approximate the quantity of drugs for sentencing purposes where . . . there has been no direct seizure of drugs directly establishing the relevant amount." United States v. Frazier, 280 F.3d 835, 851 (8th Cir. 2002). The district court may "consider any evidence in its sentencing determination as long as it has sufficient indicia of reliability to support its probable accuracy." United States v. Behler, 14 F.3d 1264, 1273 (8th Cir.) (internal quotations omitted), cert. denied, 513 U.S. 960 (1994). Moreover, the court can determine drug quantity using "imprecise evidence, so long as the record reflects a basis for the court's decision." United States v. Roach, 164 F.3d 403, 413-14 (8th Cir. 1998) (citation omitted), cert. denied, 528 U.S. 845 (1999). We review the district court's drug quantity determination for clear error. United States v. Gonzalez-Rodriguez, 239 F.3d 948, 953 (8th Cir. 2001). "A reviewing court will overturn a finding of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made." Id. (internal quotation omitted). This record does not convince us that the district court made a mistake in finding that Zimmer was accountable for more than 1.5 kilograms but less than 5 kilograms of methamphetamine.

"'[I]n a drug conspiracy, the district court may consider amounts from drug transactions in which the defendant was not directly involved, provided that those other dealings were part of the same course of conduct or scheme.'" United States v. Smith, 240 F.3d 732, 737 (8th Cir. 2001) (quoting United States v. Brown, 148 F.3d 1003, 1008 (8th Cir. 1998)). The defendant can only be held accountable for a

12

drug transaction or activity involving drugs where the activity was undertaken in furtherance of the conspiracy and was known to the defendant or reasonably foreseeable to him.  Id.; USSG § 1B1.3(a)(1) (stating that defendant is accountable "in the case of a jointly undertaken criminal activity [for] . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").  Zimmer facilitated Carver's introduction to Stoltz and initiated the criminal enterprise.  He expected to receive a sizable portion of the proceeds from the criminal enterprise.  It was certainly foreseeable to Zimmer that after placing Carver in Princeton, Minnesota, to manufacture and sell methamphetamine, Carver would do exactly that.  Thus, we conclude that Zimmer can be held accountable for the entire drug quantity produced by the various members of this conspiracy.

May testified that he helped Carver cook between 5 and 6 "eight-balls" of methamphetamine on 30 to 36 occasions.  An "eight-ball" is an eighth of an ounce or 3.5 grams.  Using the most conservative figures, May helped Carver cook approximately 525 grams of methamphetamine.  Sandberg testified that he accompanied Carver on two different trips during which they purchased approximately $1400 to $1500 worth of pseudoephedrine or approximately 34,000 sixty-milligram tablets of pseudoephedrine. The DEA chemist testified that the ratio of precursor material needed to make methamphetamine is almost one to one, i.e., a gram of pseudoephedrine can yield approximately one gram of finished product. Using the chemist's ratio, Sandberg helped Carver manufacture approximately 1.8 kilograms of methamphetamine.  Chandler learned how to cook methamphetamine from Carver.  He successfully cooked on 20 occasions between one-half and 5 ounces, or approximately 1.1 kilograms of methamphetamine.  Chandler and Stoltz taught Baumgartner to use the lithium method of manufacturing methamphetamine, and Baumgartner manufactured one-half pound to a pound, or 224-448 grams of methamphetamine.  The sum total is clearly in excess of 1.5 kilograms of methamphetamine and provides sufficient support to affirm the finding of the district court.

Zimmer claims that the district court erroneously classified him as a career offender within the meaning of USSG § 4B1.1. Zimmer argues that the district court erred when it concluded that one of his prior convictions for negligent discharge of a firearm was a crime of violence within the meaning of the Guidelines. This argument has no merit. As aforementioned, Zimmer's ordinary adjusted base offense level was 40. The relevant career offender offense level was 37. The Guidelines provide that if "the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply." USSG § 4B1.1. "Based on the 'fair meaning' of § 4B1.1, it logically follows that if the 'otherwise applicable' . . . offense level is greater, then the sentencing court must apply that offense level. [This] reading of § 4B1.1 . . . is consistent with the legislatures' manifest intent [that] . . . § 4B1.1 is intended as a sentence enhancement." United States v. Gay, 240 F.3d 1222, 1231 (10th Cir.) (internal citation omitted), cert. denied, 533 U.S. 939 (2001); accord United States v. Marrone, 48 F.3d 735, 740 n.9 (3d Cir.) ("A career offender's offense level is the greater of the offense level applicable to the underlying conduct or the appropriate offense level specified in section 4B1.1. "), cert. denied, 516 U.S. 836 (1995); United States v. Robinson, 935 F.2d 201, 205-06 (11th Cir. 1991) ("It would appear the negative corollary of that statement must also apply; i.e., if the offense level from the career offender table is less than the otherwise applicable offense level, the greater of the offense levels shall apply."), cert. denied, 502 U.S. 1037 (1992). The district court applied the otherwise applicable adjusted base offense level of 40 and not the applicable career offender offense level of 37. Thus, Zimmer's argument is moot.

**B. James Stoltz**

The district court entered judgment against Stoltz on February 1, 2001. The district court determined that Stoltz was accountable for more than 1.5 kilograms but less than 5 kilograms of methamphetamine, supporting a base offense level of 34. USSG § 2D1.1(c)(3). The district court further found that Stoltz was an organizer or

14

leader of a criminal enterprise involving more than five persons and applied a four-level enhancement pursuant to USSG § 3B1.1(a). As such, Stoltz's total adjusted base offense level amounted to 38, providing a sentencing range between 235 and 294 months imprisonment. The district court sentenced Stoltz to 235 months imprisonment and three years supervised release.

Stoltz argues that he received ineffective assistance of counsel in several particulars, including counsel's failure to present jury instructions regarding the defenses of "landlord-tenant relationships, threats of co-defendants and unwilling participant." (Stoltz Br. at 12.) He also alleges that his trial counsel operated under a conflict of interest. Most notable among his ineffective assistance claims, however, is Stoltz's charge, supported by an affidavit from his counsel, Mr. Jerrod Smith, that Smith failed to read the presentence investigation report and failed to advise Stoltz regarding sentencing issues. Smith's affidavit is contrary to his statements made during the sentencing hearing at which time he told the district court that he had in fact read the report and discussed it with his client. As a general rule, "[w]e will consider an ineffective assistance of counsel claim on direct appeal only in exceptional cases where the district court has developed a record on the ineffectiveness issue or where the result would otherwise be a plain miscarriage of justice." United States v. Brown, 183 F.3d 740, 743 (8th Cir. 1999). This is not such a case. The question of whether or not attorney Smith read the presentence investigation report and advised Stoltz on sentencing issues and whether Stoltz received ineffective assistance of counsel in other regards can best be resolved on collateral review. Accordingly, we decline to address these claims.

Stoltz raises numerous other challenges to his conviction and sentence. Stoltz asserts that his indictment was defective under Apprendi v. New Jersey, 530 U.S. 466 (2000), because it did not charge him as a manager or supervisor. He also asserts that his Brady rights were violated when the government failed to provide him with background information concerning a witness. He claims that the district court

15

erroneously refused to give the jury instructions regarding the existence of a buyer-seller relationship and the existence of multiple instead of single conspiracies. He argues that there was insufficient evidence to support his conviction. He raises several challenges to his sentence, including claims that the district court abused its discretion in giving Stoltz the maximum allowable sentence, that the district court erroneously determined drug quantity during sentencing, that the district court erred in applying a manager-supervisor adjustment under USSG § 3B1.1(b), that the district court failed to give him notice prior to making an upward departure, that he received an unfair sentencing hearing in violation of his due process rights, and that in the "totality of the circumstances . . . the enhancement was unconstitutional." (Stoltz Br. at 72.) We have, in the exercise of our duty, carefully considered each of the issues Stoltz has raised. "We have done so because we recognize that to the parties and counsel involved each allegation of trial court error is important." Fin. Holding Corp. v. Garnac Grain Co., Inc., 965 F.2d 591, 596 (8th Cir. 1992). This is particularly true in criminal cases. "However, as our published Internal Operating Procedures advise, 'Except in unusually complicated cases, a brief addressing more than four of five issues is often diffuse and gives the reader the impression that no single issue is very important.'" Id. (quoting Internal Operating Procedures at 19). Although the conspiracy was large, in our view, this was neither an unusual nor a complicated case. We have carefully considered the merits of each of Stoltz's arguments and find them to be without merit and unworthy of further discussion.

## C. Aaron Dale Carver

The district court entered a judgment of conviction on the conspiracy count and the firearms count on February 26, 2001. At sentencing, the district court found that Carver was responsible for over 1.5 kilograms of methamphetamine, supporting a base offense level of 34. USSG § 2D1.1(c)(3). The district court applied a two-level enhancement for reckless endangerment during flight pursuant to USSG § 3C1.2, a three-level enhancement for being a manager or supervisor of a criminal activity that

16

involved five or more participants pursuant to USSG § 3B1.1(b), and a two-level enhancement for possessing a weapon during the course of the conspiracy pursuant to USSG § 2D1.1(b)(1). Carver's total adjusted base offense level amounted to 41, and his criminal history category was V. The applicable Guidelines sentencing range was 360 months to life imprisonment. The district court sentenced Carver to consecutive sentences of 240 months on the conspiracy count and 120 months on the felon in possession count.

Like Zimmer, Carver argues that the district court applied the wrong version of the Guidelines. Like Zimmer, Carver was convicted of participating in a conspiracy that straddled the effective date of the 1997 amendments to the Sentencing Guidelines. As aforementioned, our case law indicates that in these circumstances the district court's application of the more recent Guidelines is not violative of the Ex Post Facto Clause. Cooper, 35 F.3d at 1251; Reetz, 18 F.3d at 598. Carver argues that he had withdrawn from the conspiracy before the more punitive guidelines went into effect. We reiterate that it is not easy to prove withdrawal from a conspiracy: Carver bears the burden of showing that he made a clean breast of the conspiracy or communicated his intent to withdraw to his coconspirators. Grimmett, 236 F.3d at 454; Granados, 962 F.2d at 773. We conclude that Carver has not met his burden to show a withdrawal. Independently, even assuming that Carver had withdrawn from the conspiracy, his argument gains him nothing. Under the version of the Guidelines he asks to be sentenced under, Carver's adjusted base offense level would have amounted to 39 instead of 41, but the applicable sentencing range would have still been 360 months to life imprisonment. See U.S. Sentencing Guidelines Manual (Nov. 1995). Accordingly, because the application of the Guidelines as amended did not "produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime [was] committed," Reetz, 18 F.3d at 598, we conclude that no ex post facto violation occurred.

17

We also conclude that the district court did not commit clear error in finding that Carver was accountable for between 1.5 and 5 kilograms of methamphetamine. Like Zimmer, Carver is responsible for all drug quantities that he knew about or that were reasonably foreseeable to him, including those previously discussed. Smith, 240 F.3d at 737; USSG § 1B1.3(a)(1). As the lead cook in this conspiracy, Carver manufactured a significant amount of methamphetamine on his own and with the assistance of others. The testimony of his coconspirators indicates that Carver personally produced or instructed others how to produce well in excess of 1.5 kilograms of methamphetamine.

Carver challenges the district court's application of a three-level enhancement for his role as a "manager" or "supervisor" within the meaning of USSG § 3B1.1(b). The Guidelines provide for a three-level enhancement if a defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants." USSG § 3B1.1(b). The district court should consider "'the nature of [the] defendant's role in the offense, the recruitment of accomplices, and the degree of participation in planning or organizing the offense.'" United States v. Skorniak, 59 F.3d 750, 757 (8th Cir. 1995) (quoting United States v. Ortiz-Martinez, 1 F.3d 662, 667 (8th Cir. 1993)), cert. denied, 516 U.S. 980 (1995). A manager or supervisor need only have managed or supervised one other participant in the criminal conspiracy. United States v. Barrett, 173 F.3d 682, 684 (8th Cir. 1999). "In addition, the enhancement may apply even if the management activity was limited to a single transaction." United States v. Garrison, 168 F.3d 1089, 1096 (8th Cir. 1999). We review the district court's determination for clear error. Skorniak, 59 F.3d at 757.

It is undisputed that this conspiracy involved more than five persons, and Carver cannot seriously dispute that he exercised managerial or supervisory authority over at least one other coconspirator on at least one occasion. On 30 to 36 different occasions, Carver directed the activity of coconspirator May when May assisted Carver in cooking methamphetamine. Carver directed Sandberg in the procurement

of a significant amount of ephedrine pills to make methamphetamine. Carver taught Chandler how to extract ephedrine from the precursor drugs and how to set up a methamphetamine lab. Carver even created a videotape instructing others how to manufacture methamphetamine. Accordingly, we conclude that there is sufficient evidence supporting the application of the role in the offense enhancement.

Carver asserts that the district court erred in denying his motion for a two-level sentence reduction for acceptance of responsibility. The Guidelines provide for a two-level reduction where a defendant "clearly demonstrates acceptance of responsibility for his offense." USSG § 3E1.1(a). The district court's determination is given great deference. Gonzalez-Rodriguez, 239 F.3d at 954. "Because of the district court's unique vantage point, we will overturn the court's decision to deny an acceptance of responsibility reduction only if it is without foundation." Skorniak, 59 F.3d at 757 (internal quotation omitted). We review the district court's determination for clear error. United States v. Ervasti, 201 F.3d 1029, 1044 (8th Cir. 2000).

Carver put the government to its burden of proof at trial. The acceptance of responsibility reduction generally does not "apply to a defendant who puts the government to its burden of proof at trial by denying factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." USSG § 3E1.1, comment. (n.2). "Only in rare situations may a defendant demonstrate an acceptance of responsibility after exercising his constitutional right to trial." United States v. Smith, 40 F.3d 933, 936 (8th Cir. 1994) (internal quotation omitted). Such a rare circumstance would occur "when the issues for trial did not relate to factual guilt." Gonzalez-Rodriguez, 239 F.3d at 954. At trial, Carver argued that he was not a part of this conspiracy and that he did not move to Minnesota to manufacture methamphetamine. This was clearly related to his factual guilt. Accordingly, we conclude that the district court did not err in denying Carver's motion.

Finally, Carver argues that the district court erred in imposing consecutive maximum sentences on each count of conviction. We disagree. Section 5G1.2(d) provides that when the "sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively . . . to the extent necessary to produce a combined sentence equal to the total punishment." USSG § 5G1.2(d). We have held that "total punishment" is the precise sentence determined by the sentencing judge from within the appropriate Guidelines range. Ervasti, 201 F.3d at 1045-46. An analysis of Carver's sentence reveals that the maximum possible sentence available on each count of conviction was alone not adequate to achieve the total punishment.

Here the district court determined that the total punishment was 360 months. Because the district court did not submit the issue of drug quantity to the jury, the constitutionally permissible maximum punishment for the drug conspiracy offense was 20 years or 240 months. 21 U.S.C. § 841(b)(1)(C); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); United States v. Aguayo-Delgado, 220 F.3d 926, 934 (8th Cir.) (concluding that Apprendi does not apply where sentence does not exceed the statutory range regardless of drug quantity), cert. denied, 531 U.S. 1026 (2000). Carver was also convicted of being a felon in possession of a firearm which carries a statutory maximum penalty of ten years. 18 U.S.C. § 924 (a)(2). In this instance, the total punishment (360 months) exceeded the maximum sentence available under each count. "The Guidelines require a district court to run sentences from multiple counts consecutively, rather than concurrently, if the Guideline sentence exceeds the statutory maximum sentence for each count." United States v. Sturgis, 238 F.3d 956, 960 (8th Cir.), cert. denied, 122 S.Ct. 182 (2001). Accordingly, the district court did not err in imposing consecutive sentences nor was the application of § 5G1.2(d) a departure, requiring a written explanation, as Carver asserts.

## III.

We affirm the judgments of the district court with respect to all three defendants.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.