# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1604

_____

| United States of America, | * | |
|---|---|---|
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Rosario Placensia, also known | * | |
| as Cheyenne, also known as Jaime, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 20, 2003

Filed:  December 18, 2003 **(Corrected 12/29/03)**

_____

Before BYE, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Rosario Placensia was convicted of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 860(a) and sentenced to 262 months imprisonment.  On appeal, he challenges the district court's[1] denial of his motion for new trial and application of the Sentencing Guidelines.  We affirm.

_____

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

I

Rosario was allegedly part of a drug trafficking conspiracy operating in Iowa, Nebraska, South Dakota, and California. He received methamphetamine from sources in California and distributed the drugs to other dealers after arranging and facilitating the shipment of the drugs from California to South Sioux City, Nebraska. The evidence establishing Rosario's involvement in the conspiracy centered on several incidents. They are below discussed in turn.

The first incident involves a police search of a house in Sioux City, Iowa, in July 1997. Following the search, the police detained Rosario and three of his brothers, Alvarado[2] Placensia, a/k/a "Bule," Jose and Jaime, along with three other individuals. Alvarado and Rosario were returned to Mexico because they were illegal aliens. The search uncovered no drugs; however police did find a can containing $25,000 and a small bag of white powder.

The second incident involves the execution of a drug search warrant in February 1998 at an apartment in South Sioux City. Rosario saw the same officer who had previously returned him to Mexico and attempted to run away. He was apprehended because of his status as an illegal alien, but was allowed to go free. The search uncovered $8,700 hidden in a vacuum cleaner which had been mailed to the apartment from California. As in the previous search warrant incident, Rosario's brother Alvarado was also present at the scene.

Jaime Romo testified at trial pursuant to a plea agreement as to the third series of events, and his testimony indicated the following: Rosario recruited Romo in 1999 to transport methamphetamine and drug money between Turlock, California, and South Sioux City. The two spent time together at a communal trailer house in South

---

[2]Rosario spells his brother's first name as Alvarado whereas the government indicates the spelling is Everardo.

Sioux City. Although Romo did not immediately agree to be recruited, he agreed to transport the drugs after being offered $5,000.

Romo was paid $5,000 per drug-carrying trip. In the first of three such trips, Rosario had Romo's "brother-in-law's brother" give him the transport car and money in California. Romo was told to call the trailer number when he arrived in South Sioux City. He did so, and Rosario and Alvarado then unloaded the drugs from the transport car. Rosario gave him $500 to cover expenses for the trip back to California.

Romo testified that less than one year later he delivered a pickup truck he got in California from his "brother-in-law's brother" to Rosario and Alvarado. When he delivered the truck to Rosario in South Sioux City, Rosario left with the truck and later returned it to Romo. Rosario then told him "it was ready to go." Rosario again gave Romo $500 to cover expenses for the trip back to California. On his way back to California, Romo was stopped by police in Utah. Officers searched the truck and found $15,000 cash hidden inside. Romo testified the police kept the $15,000 and released the truck.

In July 2001, Rosario called Romo and asked him to transport methamphetamine a third time. Romo met him, and the two discussed the details of the trip. Rosario later dropped off an automobile containing what Romo said was 16 pounds of methamphetamine. Rosario gave Romo money for the trip and instructed him to call when he got to Nebraska. While en route to meet Rosario, he was stopped by police in Lincoln, Nebraska. Police searched the car and found methamphetamine. All told, Romo testified he delivered approximately 36 pounds of methamphetamine for Rosario in the three trips.

Upon his arrest, Romo agreed to cooperate with law enforcement officers. With police assistance, he tape-recorded telephone conversations with Rosario and Alvarado in an attempt to complete a controlled delivery of the drugs. The

-3-

conversations were in Spanish. The tapes revealed Romo called Rosario and Alvarado, who told him to deliver a car containing the drugs to a third person. Rosario stated he did not want anything to do with the car at that time because he was suspicious police were watching him. Romo then delivered the methamphetamine as directed.

Subsequently, law enforcement officers began an extensive wire-tap investigation after obtaining a federal court order authorizing the interception of calls on telephones in the names of Juan Carlos Munoz, a/k/a "Charlie," and his brother Humberto Munoz Rodriguez, a/k/a Alexander Araiza, a/k/a "Beto." Both of these individuals were subsequently convicted of methamphetamine conspiracy after a jury trial. Of the approximately 1,800 telephone calls monitored in the wire-tap, about 250 were between Rosario and the Munoz brothers.

In one intercepted phone call, Rosario said two "narcos" had been following him. In another call, Rosario and the Munoz brothers discussed methamphetamine and cocaine using code names for drugs. Tapes of some of these calls were introduced at trial.

The government also introduced tape-recorded telephone calls to establish Rosario supplied drugs to Beto Munoz, who in turn supplied the drugs to others. There were also a series of telephone calls between persons identified as Shawn Stevens, a/k/a "Chava," Beto, Rosario, and Charlie Munoz. As a result of this series of calls, agents believed Rosario was going to supply Charlie Munoz with drugs and they would be delivered to Chava. These theories were borne out by subsequent surveillance.

The jury convicted Rosario of conspiracy to distribute methamphetamine, and the court sentenced him to 262 months imprisonment.

II

Rosario appeals the district court's denial of his motion for new trial. A defendant is not entitled to a new trial "unless 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" United States v. Espinosa, 300 F.3d 981, 983 (8th Cir. 2002) (citations omitted). A district court's decision on whether to grant a new trial is reviewed for abuse of discretion. United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment." United States v. McNeil, 90 F.3d 298, 300 (8th Cir. 1996).

Rosario contends the evidence was insufficient to support the verdict. Such contention is without merit. Conviction of Rosario of conspiracy to distribute illegal drugs required the government to prove beyond a reasonable doubt (1) there was an agreement to distribute illegal drugs, (2) Rosario knew of the conspiracy, and (3) Rosario knowingly became part of the conspiracy. United States v. Mora-Higuera, 269 F.3d 905, 910 (8th Cir. 2001). A conspiracy may be inferred entirely or in part from circumstantial evidence. Id. It is unnecessary for co-conspirators to know each other or the extent of the conspiracy. United States v. Cordova, 157 F.3d 587, 597 (8th Cir. 1998).

We find there was ample evidence to establish the existence of a conspiracy and Rosario's knowing participation in it. The government presented evidence of guilt through tape-recorded telephone calls which provided strong evidence of Rosario arranging drug transactions; testimony from a co-conspirator stating Rosario was part of the conspiracy and providing details of how Rosario hired him to transport drugs and money between California and Nebraska; testimony from investigating officers concerning surveillance of Rosario and his associates; evidence

Rosario used several aliases; and testimony from officers concerning evidence found at several search scenes where Rosario was present.

While Rosario challenges Romo's credibility, the district court was entitled to assess the credibility of Romo and find Romo's testimony, combined with the other evidence, sufficient to support the jury's guilty verdict. When evaluating a new trial motion based on allegations the evidence does not support the verdict, the trial court may "weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).

The testimony of an accomplice alone may be sufficient to convict a defendant if the testimony is not incredible or insubstantial on its face. United States v. J.H.H., 22 F.3d 821, 830 (8th Cir. 1994). This is true even if the testimony is uncorroborated. See id.; see also United States v. Aguayo-Delgado, 220 F.3d 926, 935 (8th Cir. 2000). Also, Rosario's own tape-recorded statements corroborated aspects of Romo's testimony. As an example, Rosario directed Romo to deliver drugs to a third individual, because Rosario was "too hot" to meet Romo himself. Additionally, when Rosario's home was searched the day of his arrest, officers found the cell phone he used when talking to Romo. In this case, the evidence against Rosario was substantial and there is nothing to indicate the district court abused its discretion in denying his motion for a new trial based on insufficiency of the evidence.

Rosario contends the district court should be reversed for its denial of his motion for new trial because of being prejudiced by the superceding indictment which broadened the period of the alleged conspiracy to 1997 and 1998, which enabled the government to introduce evidence of numerous additional acts not charged in the original indictment. Specifically, he contends being prejudiced through the introduction of the evidence of events recounted above under the discussion of earlier incidents, which could not have been introduced but for the second indictment.

Because Rosario did not move in limine prior to trial to preclude this evidence, and did not object when the evidence was offered at trial, we review the issue for plain error. See United States v. Zerba, 21 F.3d 250, 253 (8th Cir. 1994). To establish plain error, Rosario must show an obvious error affecting his substantial rights. United States v. Williams, 295 F.3d 817, 819 (8th Cir. 2002), cert. denied, 123 S. Ct. 1007 (2003).

Reviewing for plain error, we find none. The superceding indictment extended the time frame of the conspiracy to include acts which were part of the same conspiracy. Evidence Rosario and his brother Alvarado were both present in July 1997 and February 1998 at the scene of drug search warrants, where large sums of money and drug-related items were found, went toward establishing Rosario's involvement in the same ongoing conduct. The district court has "particularly broad discretion" in determining the evidence to be admitted in a conspiracy trial. United States v. Hester, 140 F.3d 753, 759 (8th Cir. 1998). See also United States v. Kime, 99 F.3d 870, 881 (8th Cir. 1996) (stating once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy, such as intercepted conversations and photographic evidence, may be sufficient to prove the defendant's involvement). We conclude the evidence from the previous incidents was admissible to demonstrate the existence and scope of the conspiracy and his participation therein.

Rosario next contends he was unduly prejudiced by the admission of evidence of his being in the United States illegally. It was, however, his legal counsel who initially suggested (at voir dire) Rosario's behavior may have seemed suspicious because he was in the country illegally and not because he was a drug dealer. We assume without deciding this statement did not constitute a waiver of this issue. We apply the plain error standard of review because Rosario did not object to testimony at trial he voluntarily returned to Mexico following the July 1997 search and later illegally re-entered the United States. We conclude the evidence was properly admissible.

The evidence of Rosario's illegal status functions to link him to the scene of two executed search warrants and to explain his conduct in running from the officer in the second incident.  Further, as he acknowledges, the prosecution did not attempt to draw any improper generalizations or stereotypes regarding his illegal alien status.  Thus, this case is distinguishable from United States v. Cruz-Padilla, 227 F.3d 1064, 1068-1070 (8th Cir. 2000), in which this court upheld a grant of a new trial finding improper an argument by the prosecutor suggesting if a person is illegally in the United States he is more likely to be involved in a drug conspiracy.  See also United States v. Jankowski, 194 F.3d 878, 881-82 (8th Cir. 1999) (drawing a distinction between cases in which evidence of nationality was introduced and was held to be prejudicial because the government commented negatively on such status and cases in which the evidence was introduced and held to be proper because the prosecutor did not comment negatively or draw inferences based on the citizenship status).  For these reasons, we find no plain error as to the admission of his illegal alien status.

Rosario also contends the opinions of the interrelation of "drug terms" offered by the government through the testimony of task force agents warrants a new trial.  At trial, task force agent Troy Boone provided expert testimony concerning terms commonly used by drug dealers in the Sioux City, Iowa, region when referring to methamphetamine and cocaine.  Such terms include, inter alia, "stinky," "onions," "snow white," "doves," and "white t-shirts."  Task force agent Troy Hansen provided similar expert testimony.  Rosario alleges the agents' opinions regarding the meaning of those terms was based upon hearsay.

Law enforcement officers may testify as experts concerning the modus operandi of drug dealers as such activities are not something with which most jurors would be familiar.  See United States v. Brown, 110 F.3d 605, 610 (8th Cir. 1997).  Significantly, we have held experts may help the jury with the meaning of jargon and code words.  In United States v. Delpit, 94 F.3d 1134, 1145 (8th Cir. 1996), we observed:  "There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis."  Further, the task force

agents' testimony in this matter was based on personal experience and training and not merely upon the hearsay testimony of non-witness drug dealers. Both agents testified concerning their experience as narcotics investigators and testified they each had purchased methamphetamine as undercover officers.

In this matter, the government's investigation and prosecution depended heavily on wiretapped telephone conversations. Because the tapes were permeated with such slang terms, the agents' testimony was necessary to explain the terms to the jury. For these reasons, we conclude the district court properly admitted drug jargon evidence at trial.

Rosario next contends the district court erred in allowing the translated transcripts of foreign language tape recordings as evidence for use by the jury during trial and deliberations. He concedes the parties agreed upon the translations, yet contends he had not anticipated they would be provided to the jury. He argues absent stipulation of the parties the transcripts should not have gone to the jury because this resulted in over-emphasis of the content of the transcripts.

The court gave the jury a preliminary instruction on recorded conversations, which stated, in part:

> Recording itself is the primary evidence of its own contents. Where the discussions were in English, transcripts are not evidence. On the other hand, where the discussions were in Spanish, transcripts of the discussions as translated into English are evidence, and you may consider those transcripts like any other evidence during your deliberations.

We conclude the district court properly allowed the translated transcripts of foreign language tape recordings as evidence for use by the jury during trial and deliberations where Rosario conceded the accuracy of the transcripts. It is well settled in this circuit the jury may use transcripts of taped conversations during trial

and deliberations.  Delpit, 94 F.3d at 1147 (finding translated transcripts of taped statements, partially in "Pig-Latin," were admissible).  We have also held translated transcripts of foreign language tapes are admissible at the district court's discretion, even when introduced without the tape recordings.  United States v. Grajales-Montoya, 117 F.3d 356, 367 (8th Cir. 1997).  Further, as a general rule, jurors may examine any documents properly admitted into evidence.  United States v. Williams, 87 F.3d 249, 255 (8th Cir. 1996) (citing United States v. DeCoito, 764 F.2d 690, 695 (9th Cir. 1985)).  "The trial court has 'considerable discretion' to send exhibits to the jury during its deliberation, and the court's determination will not be reversed on appeal unless it has abused its discretion."  Id.

### III

Turning to Rosario's challenge to the application of the Sentencing Guidelines, we first consider whether the district court properly imposed a two-level enhancement for Rosario's aggravated role in the offense pursuant to United States Sentencing Guideline (U.S.S.G.) § 3B1.1(c), when the court found he was an organizer, leader, manager, or supervisor in the conspiracy.

When reviewing the district court's enhancement for an aggravating role in a conspiracy, the findings of fact are reviewed for clear error.  See United States v. Zimmer, 299 F.3d 710, 719 (8th Cir. 2002); United States v. Gelinas, 299 F.3d 978, 979 (8th Cir. 2002); United States v. Mayer, 130 F.3d 338, 339 (8th Cir. 1997).  The government has the burden of proving the defendant acted in an enhanced role. Zimmer, 299 F.3d at 719.  Rosario asserts the government did not produce sufficient evidence to establish his role as an organizer, leader, manager, or supervisor in the conspiracy.  He further contends he did not fit the qualifications of a leader or organizer as he is illiterate.

The terms "organizer" and "leader" are broadly defined, and this court has found "[t]he defendant does not have to be *the* organizer or leader of a criminal

-10-

organization for the purposes of § 3B1.1, as there can be more than one organizer or leader of a criminal enterprise." Id. (internal quotations omitted). Nor is it necessary that the defendant "organized or led all of the other participants in the activity." Id. We find the district court did not commit clear error in finding the evidence supported role enhancement. Romo testified Rosario approached him about transporting methamphetamine, and although Romo initially declined, he later changed his mind when Rosario promised Romo $5,000 for the trip. This testimony is significant because we have previously determined a defendant who recruits accomplices and directs their activities is an organizer and leader of the criminal activity. See Zimmer, 299 F.3d at 719; United States v. Bahena, 223 F.3d 797, 804-05 (8th Cir. 2000).

Further, as recounted in detail above, when Romo phoned the trailer upon arriving with drugs in South Sioux City, Rosario answered the telephone and instructed Romo where to park. He then watched as Alvarado unloaded the car, and gave Romo $500 for the trip back to California. Finally, as the telephone recordings established, Rosario possessed authority to divert Romo's last shipment of drugs to another person when he became suspicious law enforcement officers were watching him.

The final issue before us is whether the district court erred in not granting Rosario a downward departure pursuant to U.S.S.G. § 5K2.0 or pursuant to § 5K2.13 because of his mental capacity and complete lack of education.

A district court's discretionary decision not to depart downward is unreviewable, "absent an allegation that the district court had an unconstitutional motivation or erroneously determined that it lacked the authority to depart." United States v .Young, 315 F.3d 911, 914 (8th Cir. 2003). Here Rosario has raised no cognizable argument that either of these scenarios is present, and thus we cannot review the district court's decision not to depart.

-11-

For the reasons indicated, we affirm the judgment and sentence of the district court.

_____