# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-4084

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Keith Bernard Crenshaw, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 02-4085

_____

Appeals from the United States
District Court for the
District of Minnesota.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Kamil Hakeem Johnson, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 03-1067

_____

United States of America,             *
                                            *

      Plaintiff - Appellee,      *
                                              *

      v.                        *
                                              *

Timothy Kevin McGruder,      *
                                            *

      Defendant - Appellant.    *

_____

Submitted: October 20, 2003

Filed: March 2, 2004

_____

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and BYE, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Keith Crenshaw, Timothy McGruder, and Kamil Johnson were convicted of murder in aid of racketeering and sentenced to imprisonment for life without release. They appeal their convictions, arguing that the evidence against them, which consisted mostly of the testimony of their gang leader, his relatives, and the defendants' putative get-away driver, was insufficient to support their convictions. They also contend that the statute under which they were convicted, 18 U.S.C. § 1959 (2000), is unconstitutional because it overreaches Congress's power under the

Commerce Clause. Crenshaw also contends that the district court erred in allowing evidence of his past crimes. We affirm.

On July 20, 1996, in St. Paul, Minnesota, four-year old Davisha Brantley-Gillum was returning home from a day at a neighborhood festival, Rondo Days, in a car with her mother and several other women and children. They stopped at an Amoco filling station to put air in the tire of their car. The driver of the car, Lashawn Slayden, was associated with a gang called the Bogus Boys, and two cars full of Bogus Boys had also pulled into the Amoco lot. Some men standing behind a fence at the edge of the Amoco property began shooting into the car where Davisha was sitting. A bullet passed through Davisha's head and killed her.

Police were unable to solve the crime until August 23, 2001, when police arrested Terron ("Rico") Williams, and indicted him for a ten-year conspiracy to distribute cocaine and crack, which exposed him to a sentence of thirty years to life imprisonment. Williams was the leader of the St. Paul branch of the Rolling 60s Crips, a Los Angeles-based street gang. He had joined the Rolling 60s Crips as a teenager in California. He came to Minnesota in 1987 to work in the Rolling 60s' drug business there, and rose to head the local organization, which grew to around 200 people, selling up to ten kilos of cocaine a month. Williams's brother and lieutenant, Greg ("Baby G") Hymes, was also arrested and indicted, on a charge exposing him to about fifteen to twenty years in prison. Williams gave a statement to the police naming Crenshaw, Johnson, and McGruder as the people who were involved in the Davisha Gillum case. Williams also named Maalik Harut, who then confessed to police that he had been the get-away driver and who named the defendants in this case as the other participants. Harut was charged with conspiracy to commit murder in aid of racketeering, which carries a maximum ten-year sentence. Williams, Hymes, and Harut entered plea agreements in which the government agreed to move for reductions in their respective sentences if they testified truthfully in the prosecution of the defendants in this case.

Crenshaw, Johnson and McGruder were indicted under 18 U.S.C. § 1959, for committing murder in aid of racketeering activity. Section 1959 provides:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, <u>or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity</u>, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished–
    (1) for murder, by death or life imprisonment, or a fine under this title, or both . . . .

(Emphasis added). The state law alleged to have been violated was Minn. Stat. § 609.185, subd. (a), which provides:

Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
    (1) causes the death of a human being with premeditation and with intent to effect the death of the person or of another . . . .

At trial, the chief dispute was the identity of the shooters. The primary evidence linking Crenshaw, Johnson, and McGruder to the crime was the testimony of Terron Williams; his brother, Greg Hymes; their sister, Diane Williams; Hymes's fiancee, Lavern Christopher; and Maalik Harut. Even Harut has family ties with Terron Williams, since Williams has either one or two children with Harut's sister.

Terron Williams identified McGruder and Johnson as Rolling 60s members and Crenshaw as a hanger-on, or someone who was "around us. . . all the time." Williams testified that the Rolling 60s were involved in hostilities with the Bogus Boys and

that Williams had issued an order for all Rolling 60s members to shoot Bogus Boys on sight and shoot to kill.

Williams, Hymes, Diane Williams, and Christopher all testified that the three defendants, together with Harut, showed up at Greg Hymes's apartment (either inside the apartment or in the parking lot) after the shooting and bragged about having shot at the Bogus Boys. Diane Williams, Hymes, and Christopher said the defendants bragged that they had stood on something and shot at Bogus Boys through a fence. According to Terron Williams, the four thought they had hit someone because they heard screaming. Diane Williams and Terron Williams also testified that at least two of the defendants came to a party in downtown St. Paul later the same night and continued bragging.

Harut testified that on the night of July 20, 1996, he had been driving around with the three defendants, looking for Bogus Boys. When they spotted some Bogus Boys at the Amoco station, Harut drove down Sherburne Avenue, behind the station. He waited in the car on Sherburne Avenue while the other three ran between some houses toward the Amoco station. He heard shots and the other three came back to the car saying, "We shot them." McGruder expressed disappointment that his gun didn't shoot. Harut drove away. He turned down an alley, where he believed the defendants dumped one or two of the guns.

There were three eyewitnesses to the shooting and two eyewitnesses to the getaway, but none of them ever identified any of the three defendants as the shooters. Indeed, two eyewitnesses to the shooting, Jayne Sommerfeld and Michael Biebl, picked other people's photographs out of photo spreads. Sommerfeld was not shown a photo spread that contained pictures of any of the defendants. Biebl viewed a photo spread that contained pictures of McGruder and Crenshaw, but he picked out another man as looking like one of the shooters and he picked out Terron Williams as someone he had seen that night. Two eyewitnesses said that the shooters were six

-5-

feet tall or 6'1". There was evidence that Johnson is 5'7", and Crenshaw's lawyer argued to the jury (who saw Crenshaw at trial) that Crenshaw is no more than 5'7".

The only physical evidence was the gun casings and bullets found at the scene. There were casings and bullets from at least two different guns. One set was likely to have come from a Heckler and Koch .38 caliber pistol, which is a very rare gun. Kamil Johnson's girlfriend, Patricia Banks, had such a gun until it disappeared from her apartment sometime in 1996. Banks testified that Johnson stayed at her home and would have had access to the gun. (Greg Hymes testified that he also dated Patricia Banks.) Maalik Harut testified that in the summer of 1996 he had seen Johnson with the Heckler and Koch gun. Harut said he had seen Johnson give the gun to "Six-six," a senior member of the Rolling 60s. Harut said that Johnson was eager to get the gun back because he had taken it from his girlfriend's home, and that Johnson later told Harut he got the gun back. The bullet that killed Davisha Gillum matched Black Talon ammunition that police found at Banks's apartment. Black Talon is a rare type of ammunition that a friend gave Banks for use in the Heckler and Koch gun.

On this evidence, the defendants were convicted and sentenced to life imprisonment without release.

I.

McGruder and Johnson argue that 18 U.S.C. § 1959 is unconstitutional both facially and as applied because the regulated activity lacks the requisite connection to interstate commerce.[1]

---

[1]It is not entirely clear whether Johnson's brief makes a facial challenge to the constitutionality of § 1959 or whether it merely challenges the statute as applied. Because the outcome is the same either way, we will assume he made both arguments. Defendant Crenshaw is excluded from this section because he did not appeal the constitutional issue.

Johnson filed a motion in the district court to dismiss the indictment on the ground that § 1959 is unconstitutional. McGruder did not join the motion in the district court, but raises the constitutional challenge for the first time on appeal. Thus, we review Johnson's constitutional claim de novo, see United States v. Gary, 341 F.3d 829, 835 (8th Cir. 2003), cert. denied, 2004 WL 47213 (Jan.12, 2004) (No. 63-7814), but technically should consider McGruder's appeal under the "plain error"standard, see United States v. Letts, 264 F.3d 787, 789 (8th Cir. 2001), cert. denied, 535 U.S. 908 (2002). The anomaly of considering the same issue under two different standards of review is immaterial because our conclusion is the same under either standard.

Congress enacted § 1959 to complement the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, by making it a federal crime to commit violent acts for the purpose of maintaining or increasing one's position within a RICO enterprise. See United States v. Concepcion, 983 F.2d 369, 380-81 (2d Cir. 1992). Section 1959 limits the definition of enterprise to entities "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959 (b)(2). The statute does not require the violent acts themselves to have any connection to interstate commerce other than that they were committed for the purpose of establishing or maintaining a position within the enterprise.

We first note that the "as applied" constitutional challenge raised by McGruder and Johnson is really not a constitutional objection at all, but is a challenge to the sufficiency of the evidence supporting the jury verdict. The defendants argue that, even if the statute is facially constitutional, this particular application of the statute is unconstitutional because there was not proof of a sufficient connection between the murder and interstate commerce. However, the connection to interstate commerce

was explicitly presented to the jury as one of the elements in the government's case.[2] Thus, "a claim of an insufficient connection to interstate commerce is a challenge to one of the elements of the government's case and is therefore considered a claim about the sufficiency of the evidence." United States v. Riddle, 249 F.3d 529, 536 (6th Cir. 2001). We will consider in section II.B.(3) whether there was adequate proof that the enterprise was engaged in or its activities affected interstate commerce.

In their facial challenge to § 1959, McGruder and Johnson rely primarily on United States v. Lopez, 514 U.S. 549 (1995). In Lopez, the Supreme Court considered the constitutionality of one section of the Gun-Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A). The Court summarized the history of Commerce Clause jurisprudence and identified three categories of activity that Congress may regulate under that clause: 1) the use of the channels of interstate commerce; 2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though a particular threat may come only from intrastate activities; and 3) those activities that "substantially affect[]" interstate commerce. Lopez, 514 U.S. at 558-59. The Court ultimately concluded that § 922(q) implicated the third category, but struck down the statute because the government failed to establish that the regulated activity substantially affected interstate commerce. In particular, the Court noted that gun possession was not inherently related to "commerce" and that § 922(q) did not contain a jurisdictional element to ensure, on a case-by-case basis, that the unlawful activity affected interstate commerce. Id. at 561-62; see also United States v. Morrison, 529 U.S. 598 (2000) (striking down a

---

[2]The district court instructed the jury, "The government must prove beyond a reasonable doubt that the criminal enterprise itself or the racketeering activities of those associated with it had some effect on interstate or foreign commerce. This effect on interstate commerce could have occurred in any way, and it need only have been minimal."

portion of the Violence Against Women Act of 1994). The defendants argue that Lopez requires us to strike down § 1959 because the regulated activity does not substantially affect interstate commerce.

Initially, we must determine whether the substantial effects test even applies to § 1959. The government argues that the jurisdictional element contained in § 1959 renders the test unnecessary because it ensures that the enterprise in each case is engaged in or affects interstate commerce. 18 U.S.C. § 1959(b)(2). Although Lopez and Morrison acknowledge that the presence of a jurisdictional element lends support to the facial constitutionality of a statute, see Lopez, 514 U.S. at 561-62; Morrison, 529 U.S. at 613, those cases do not suggest that a jurisdictional element obviates the need for applying the substantial effects test. Nor do we read those cases to say that the presence of a jurisdictional element *per se* demonstrates that a statute meets the substantial effects test. See Morrison, 529 U.S. at 613 ("[A] jurisdictional element would *lend support* to the argument that [the challenged statute] is sufficiently tied to interstate commerce. . . .") (emphasis added). But see United States v. Torres, 129 F.3d 710, 717 (2d Cir. 1997) ("The substantial effect requirement is satisfied when criminal statutes contain a jurisdictional element. . . ."). Indeed, the district court in this case instructed the jury that it need only find that the enterprise had a "minimal" effect on interstate commerce in order to convict the defendants. Requiring the government to prove a minimal effect on interstate commerce in particular cases does not seem adequate by itself to establish that the regulated activity on the whole "substantially affects" interstate commerce. Cf. United States v. Odom, 252 F.3d 1289, 1296 (11th Cir. 2001) ("Allowing the government to meet the interstate commerce requirement [in a prosecution under federal arson statute] through only a nominal showing of a connection to interstate commerce would do as much to

-9-

'completely obliterate' the distinction between national and local authority as if no jurisdictional requirement existed at all.") <u>cert denied</u>, 535 U.S. 1058 (2002).[3]

The fact that § 1959 sometimes may be applied to enterprises "engaged in" interstate commerce also does not make the substantial effects test inapplicable. We have recognized that the use of language similar to "engaged in, or the activities of which affect, interstate or foreign commerce" indicates that Congress intended a statute to extend to the outer limits of the Commerce Clause. <u>See</u> <u>United States v. Mosby</u>, 60 F.3d 454, 456 (8th Cir. 1995) ("The phrase 'in or affecting commerce' is a term of art that indicates a congressional intent to invoke the full extent of its commerce power."). <u>Lopez</u> illustrates that when Congress nears the outer limits of its power under the Commerce Clause by regulating intrastate activity that may only "affect" interstate commerce, courts must apply the substantial effects test. Thus, a statute containing the "engaged in, or the activities of which affect" language can survive intact only if it satisfies the substantial effects test. <u>See</u> <u>United States v. Torres</u>, 129 F.3d 710, 717 (2d Cir. 1997) (applying substantial effects test to § 1959).

---

[3]We do not understand McGruder or Johnson to be challenging the jury instruction itself. In any event, other courts have held that the enterprise need only have a minimal effect on interstate commerce in individual cases under § 1959. <u>United States v. Riddle</u>, 249 F.3d 529, 538 (6th Cir. 2001); <u>United States v. Gray</u>, 137 F.3d 765, 773 (4th Cir. 1998); <u>see also</u> <u>United States v. Juvenile Male</u>, 118 F.3d 1344, 1347-49 (9th Cir. 1997) (<em>de minimis</em> effect is sufficient in RICO prosecutions). These holdings derive from the Supreme Court's recognition in <u>Lopez</u> that "where <em>a general regulatory statute bears a substantial relation to commerce</em>, the <em>de minimis</em> character of individual instances arising under that statute is of no consequence." 514 U.S. at 558 (emphasis in original) (quoting <u>Maryland v. Wirtz</u>, 392 U.S. 183, 197 n.27 (1968), <u>overruled on other grounds</u>, <u>Nat'l League of Cities v. Usery</u>, 426 U.S. 833 (1976), <u>overruled by</u> <u>Garcia v. San Antonio Metro. Transit Authority</u>, 469 U.S. 528 (1985)). We are persuaded by this reasoning.

-10-

We conclude that the activity regulated by § 1959 substantially affects interstate commerce. The connection between *intra*state acts of violence committed by RICO enterprises and the enterprises' *inter*state commerce activity seems difficult to deny. It is well-established, for example, that drug trafficking and other forms of organized crime have a sufficient effect on interstate commerce to allow for regulation by Congress. See, e.g., United States v. Patterson, 140 F.3d 767, 772 (8th Cir. 1998) ("Our circuit has held that intrastate drug activity affects interstate commerce and that Congress may regulate both intrastate and interstate drug trafficking under the Commerce Clause."); United States v. Feliciano, 223 F.3d 102, 118 (2d Cir. 2000) (describing RICO narcotics trafficking and money laundering offenses as "economic activities that in the aggregate have a substantial effect on interstate commerce"). It seems equally clear that criminal enterprises use violence or the threat of violence in connection with their commercial activities; indeed, a simple review of facts from RICO cases reveals numerous examples. See, e.g., United States v. Phillips, 239 F.3d 829, 835 (7th Cir. 2001) (describing how gang members would assault any non-member who attempted to sell crack); United States v. Tse, 135 F.3d 200, 203-04 (1st Cir. 1998) (leader of a gang involved in illegal gambling operations, extortion, and other illegal conduct ordered members of his gang to murder non-members who had threatened the gang's dominance); see also S. Rep. No. 98-225, at 304, reprinted in 1984 U.S.C.C.A.N. 3182, 3483 (describing murder and other violent crime as an "integral aspect of membership in an enterprise engaged in racketeering activity"). The regulation of violent acts committed as an aspect of membership in RICO enterprises therefore represents one method for Congress to exercise its power under the Commerce Clause to regulate the enterprises themselves.

The jurisdictional element in § 1959 further illustrates the connection between interstate commerce and the activity regulated by the statute. First, it ensures that the enterprise in each case is at least minimally connected to interstate commerce. In addition, the jurisdictional element demonstrates a fundamental difference between

§ 1959 and the statutes struck down in Lopez and Morrison. The Court struck down the gun possession statute in Lopez largely because it was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Lopez, 514 U.S. at 561; see also Morrison, 529 U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States"). By contrast, Congress here is regulating activity by gangs and other "enterprises" that are *by definition* engaged in or have an effect on interstate or foreign commerce. 18 U.S.C. § 1959(b)(2). The fact that this particular provision of the statute deals with the groups' *intra*state violent activities does not change the overall *inter*state character of the regulation. See United States v. Kehoe, 310 F.3d 579, 588 (8th Cir. 2002) (upholding § 1959 against Tenth Amendment challenge and explaining, "RICO criminalizes the furthering of the enterprise, not the predicate acts.") (internal quotation marks omitted), cert. denied, 123 S.Ct. 2112 (2003); S. Rep. No. 98-225, at 305, reprinted in 1984 U.S.C.C.A.N. 3182, 3484 ("[T]he need for Federal jurisdiction [over violent acts committed by members of a RICO enterprise] is clear, in view of the Federal Government's strong interest, as recognized in existing statutes, in suppressing the activities of organized criminal enterprises. . . .").

We uphold § 1959 as a permissible exercise of Congress's power under the Commerce Clause and reject the constitutional challenges made by McGruder and Johnson.

## II.

Next, we consider the defendants' challenges to the sufficiency of the evidence. For the most part, the defendants do not contend that there is a lack of evidence, but rather that the inculpatory evidence is too flawed to support their convictions. The defendants argue that the government's key witnesses on the issue of identity stood

to gain by inculpating the defendants, either because the witnesses were themselves hoping for a sentence reduction or because they hoped to benefit Hymes and Williams. The defendants also argue that the identity witnesses' testimony was so riddled with inconsistencies that their testimony is unsubstantial.

A.

The principles governing our review of the sufficiency of the evidence to support a criminal conviction are laid out in two Supreme Court cases. Glasser v. United States, 315 U.S. 60 (1942), stated the substantial evidence standard, laying out both the quantum of evidence required and the method for evaluating the evidence on appeal: "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Id. at 80.

Jackson v. Virginia, 443 U.S. 307, 313-20 (1979), made clear that in a criminal case, substantial evidence means evidence sufficient to prove the elements of the crime beyond a reasonable doubt. In habeas review of a state conviction, the Court held that constitutional due process "protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt." Id. at 313-14. Justice Stewart explained that the Jackson standard was not new, but was consistent with that stated in Glasser. 443 U.S. at 318-19 & n.12. In particular, the methodology for evaluating the evidence was unchanged by Jackson:

> [T]his inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the

-13-

responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

Id. at 318-19 (internal quotation marks and citations omitted).

Even though Glasser and Jackson agree that a reviewing court is not to weigh evidence or judge credibility, the court must nevertheless evaluate the evidence to assure that it rises to the minimum level described in Jackson. "Although ordinarily witness credibility is left completely to the jury and is beyond appellate review, we must reverse a conviction if no reasonable person could believe the incriminating testimony." United States v. Watson, 952 F.2d 982, 988 (8th Cir. 1991) (citations omitted); accord United States v. Lanier, 578 F.2d 1246, 1251 (8th Cir. 1978) (quoting with approval statement that "Appellate review of credibility is prohibited absent extraordinary circumstances."). The test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible. See, e.g., United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985) (testimony must assert "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature"); United States v. Mendez-Zamora, 296 F.3d 1013, 1018 (10th Cir.) (same), cert. denied, 537 U.S. 1063 (2002); United States v. White, 219 F.3d 442, 448 (5th Cir. 2000) (same); United States v. Hernandez, 13 F.3d 248, 252-53 (7th Cir. 1994) ("impossible under the laws of nature for the occurrence to have taken place at all").

Testimony does not become legally unsubstantial because the witness stands to gain by lying; the defendant is entitled to cross-examine such witnesses to expose

their motivations, and it is up to the jury to decide whether the witness is telling the truth despite incentives to lie. In <u>Hoffa v. United States</u>, 385 U.S. 293 (1966), the conviction depended upon the testimony of Partin, an informer who received both money and clemency for his cooperation. The Supreme Court rejected the argument that Partin's testimony was constitutionally inadmissible because he had motives to lie: "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." <u>Id.</u> at 311; <u>accord</u>, <u>e.g.</u>, <u>United States v. Reeves</u>, 83 F.3d 203, 206-07 (8th Cir. 1996) (upholding convictions that depended on the testimony of three admitted co-conspirators who had been given reduced sentences in exchange for their testimony); <u>United States v. Lopez</u>, 42 F.3d 463, 466-67 (8th Cir. 1994) (upholding convictions based on testimony of a paid informant who had been granted immunity from prosecution).

In particular, testimony of accomplices, who often have an interest in inculpating someone else, is not rendered insubstantial because of the witnesses' self-interest.[4] We have stated the rule: "[T]he uncorroborated testimony of an accomplice

---

[4]McGruder argues that the district court failed to instruct the jury in accordance with Minn. Stat. § 634.04 (2003), which provides that a conviction cannot be based upon uncorroborated accomplice testimony. State procedural rules generally do not govern at a federal trial. <u>United States v. Kehoe</u>, 310 F.3d 579, 591 (8th Cir. 2002), <u>cert. denied</u>, 123 S. Ct. 2112 (2003). McGruder did not request a jury instruction on the accomplice testimony rule, and therefore we review the failure to instruct only for plain error. <u>United States v. Brown</u>, 330 F.3d 1073, 1078 (8th Cir.), <u>cert. denied</u>, 124 S. Ct. 453 (2003).

We understand McGruder's argument to be that the accomplice corroboration rule is a substantive defense to the Minnesota murder offense incorporated by reference in § 1959. In <u>Kehoe</u>, we characterized a state accomplice evidence rule as a procedural rule, which would not have been applicable in a federal § 1959 prosecution, except for the fact the government had failed to object to an accomplice instruction based on state law. 310 F.3d at 591. Other circuits have held that state accomplice corroboration rules were procedural in nature and therefore did not apply

-15-

is sufficient to sustain a conviction if it is not <u>otherwise</u> incredible or unsubstantial on its face." <u>United States v. Resnick</u>, 745 F.2d 1179, 1185 (8th Cir. 1984) (quoting <u>United States v. Taylor</u>, 599 F.2d 832, 838 (8th Cir. 1979) (emphasis added)); <u>accord</u> <u>United States v. Stelivan</u>, 125 F.3d 603, 607 (8th Cir. 1997); <u>United States v. Drews</u>, 877 F.2d 10, 13 (8th Cir. 1989); <u>United States v. Wilkerson</u>, 691 F.2d 425, 427 (8th Cir. 1982); <u>Caton v. United States</u>, 407 F.2d 367, 371 (8th Cir. 1969) ("The testimony of an accomplice is not necessarily incredible because he expects or hope to receive a lessened penalty or dismissal of the charges against him for turning state's evidence.").

We are aware of one case in which a witness's self-interest may have played a role in our holding that inculpating testimony was unsubstantial. In <u>United States v. Waterman</u>, 704 F.2d 1014, 1017-18 (8th Cir. 1983), we reversed a mail fraud conviction arising out of an arson for profit scheme. The conviction and several

---

in federal RICO trials. <u>United States v. Paone</u>, 782 F.2d 386, 393 (2d Cir. 1986); <u>United States v. Erwin</u>, 793 F.2d 656, 669-70 (5th Cir. 1986). The same reasoning has been applied in § 1959 cases. <u>United States v. Shryock</u>, 342 F.3d 948, 987 (9th Cir. 2003); <u>United States v. Wei</u>, 862 F.Supp. 1129, 1138 (S.D.N.Y. 1994); <u>cf.</u> <u>Kehoe</u>, 310 F.3d at 588 (stating in § 1959 case, "Congress did not intend to incorporate the various states's procedural and evidentiary rules into the RICO statute.") (internal quotation marks omitted). McGruder has not shown that the district court committed plain error in failing to instruct on the accomplice corroboration rule.

McGruder also argues that there was no evidence corroborating the accomplices' testimony. Even putting aside the applicability of the Minnesota rule, the argument has no merit. The testimony of Harut, Terron Williams and Hymes, who were or may have been accomplices, was corroborated by the testimony of Lavern Christopher and Diane Williams, who were not accomplices. <u>See</u> <u>State v. Pietraszewski</u>, 283 N.W.2d 887, 892 (Minn. 1979) (accessory after the fact is not an accomplice).

others were supported by the testimony of Gamst, who participated in most of the arsons. However, one count was based on Gamst's testimony that Waterman told him Waterman had "torched" his girlfriend's house and had received $17,000 in insurance from the fire. The house had burned, but the company paid out only about $14,000 and did not find evidence of arson. We reversed the conviction on that count because "[t]he only evidence linking Waterman to the fire came from Gamst, whose testimony was, at best, only marginally probative." Id. at 1018. We held that Gamst's testimony was not substantial evidence. Although we did not say so in our opinion, our holding was consistent with the common-law rule that a defendant's out-of-court admissions after the crime are not sufficient to support a conviction unless every element of the crime is corroborated by other evidence. See Opper v. United States, 348 U.S. 84, 89-91 (1954); United States v. Todd, 657 F.2d 212, 216 (8th Cir. 1981). This rule of law arose from the concern that "the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession." Opper, 348 U.S. at 89-90 (emphasis added). In other words, unsworn confessions have so little probative value and are so easily manufactured by a self-interested witness that we do not even entrust the jury with assessing them unless they are corroborated. Gamst's recounting of Waterman's out-of-court admissions was not corroborated and therefore was insufficient as a matter of law to support Waterman's conviction. Thus, the self-interest of the witness, though not enough in itself to render testimony incredible, combined with extremely low probative value of the testimony to render the testimony unsubstantial according to a common-law rule.

Defendants often suggest in particular cases that inconsistencies within the witness's testimony or between the testimony and the witness's earlier statements render the testimony incredible on its face. E.g., Stelivan, 125 F.3d at 607; Wilkerson, 691 F.2d at 427 & n.2. In what may be the high watermark for this kind of argument, the Eleventh Circuit once reversed a conviction that depended entirely

on the testimony of the victim about whether she was transported across a state line without her consent. In United States v. Chancey, 715 F.2d 543, 546-47 (11th Cir. 1983), the court said: "Miss Tamara Kay Goshern is the sole witness to lack of consent. Regardless of what she says, her every act and deed, as she described them, shout that when she drove the car across the Florida state line she did it voluntarily." This court has neither rejected nor espoused Chancey, but we have distinguished it. See United States v. Wright, 340 F.3d 724, 731 (8th Cir. 2003); United States v. Hernandez-Orozco, 151 F.3d 866, 869-70 (8th Cir. 1998).

Regardless of whether Chancey could be harmonized with our Circuit's cases assessing sufficiency of the evidence, its holding is limited to the rare case in which there is nothing but a witness's conflicted testimony to support the conviction. In discussing claims that inconsistencies fatally undermined a verdict, we have identified numerous factors that make it reasonable to uphold a verdict despite inconsistencies in testimony. For instance, where the inconsistencies did not go to the heart of the witness's testimony regarding guilt or innocence, we have held that the witness's testimony remains "substantial" despite collateral inconsistencies. See, e.g., United States v. Kragness, 830 F.2d 842, 865 (8th Cir. 1987) (witness's inconsistencies regarding dates of events "were not such major flaws that his testimony was unbelievable"); Wilkerson, 691 F.2d at 427 (inconsistencies "do not seriously undermine" conclusion of guilt). Where other evidence corroborated the testimony under attack, the testimony remained "substantial" despite the inconsistencies. See, e.g., United States v. Eagle Elk, 658 F.2d 644, 647 (8th Cir. 1981). Where the witness's inconsistency could actually be reconciled by interpretation or other reasonable explanation, whether to resolve the apparent conflict or reject the testimony was up to the jury. United States v. Crow, 148 F.3d 1048, 1050 (8th Cir. 1998) (jury was entitled to "resolve any contradictions in the evidence."). Where the inconsistency was an omission in one version of the story, rather than an outright contradiction, we have upheld the conviction. See Stelivan, 125 F.3d at 607 n. 4. We have frequently placed importance on the defendant's

-18-

opportunity to expose to the jury the inconsistency between a witness's trial testimony and earlier inconsistent statements. E.g., Stelivan, 125 F.3d at 607 n.4. See United States v. Steele, 178 F.3d 1230, 1236 (11th Cir. 1999) ("An argument that a witness was incredible as a matter of law is weakened when the defendant cross-examined the witness concerning the alleged lies or inconsistencies and the judge instructed the jurors on the degree of suspicion they should hold . . . .").

Thus, in considering the defendants' attacks on the testimony of the witnesses against them, we pay particular attention to whether other evidence supports the testimony in question, whether the alleged inconsistencies are collateral or central to the elements of the crime, whether the inconsistencies are amenable to explanation, and whether they have been exposed to the jury. Using these guideposts, this case falls well within the zone of evidentiary sufficiency.

B.

The elements of murder in aid of racketeering activity are: (1) there was an enterprise; (2) the enterprise was engaged in racketeering activity as defined in 18 U.S.C. § 1961, which includes dealing in controlled substances; (3) the enterprise was engaged in or its activities affected interstate or foreign commerce; (4) the defendant committed murder; and (5) the defendant committed the murder for a statutorily listed purpose, in this case, for the purpose of gaining entrance to or maintaining or increasing his position in the enterprise. 18 U.S.C. § 1959. We consider the sufficiency of the evidence to prove each element in turn.

(1)

McGruder argues that there was insufficient evidence that there was an enterprise. The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function

as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). We have identified three characteristics which an enterprise must have: a common purpose shared by the individual associates; some continuity of structure and personnel; and structure distinct from that inherent in the racketeering activity alleged. United States v. Kragness, 830 F.2d 842, 855 (8th Cir. 1987). The distinct-structure element can be shown by patterns of retaliation and intimidation undertaken to protect and defend the enterprise's business and associates, see United States v. Davidson, 122 F.3d 531, 535 (8th Cir. 1997), and by regular training, oversight, and coordination of associates, see United States v. Darden, 70 F.3d 1507, 1520-21 (8th Cir. 1995).

The evidence at trial showed that the Rolling 60s Crips were a local unit of a larger organization based in California. The Rolling 60s were known among themselves and among others as a "gang." They engaged in the business of selling cocaine. Membership was ordinarily earned by being "jumped in," that is, by participating in a formal fight with an established gang member in front of witnesses. There was a hierarchy of members, ranging from the senior "OG's" or "Inner Circle," down through the "little homeys" or "shorties." Members had gang names which were coded to reveal their standing within the gang and their relationship with other members. For instance, the protege of a senior member would take that member's name, with the prefix "Little." Members were subject to rules, including the mandatory retaliation rule, which required every member to actively avenge any injury offered a gang member by anyone from another gang. The silence rule required members not to divulge gang activities, or as Greg Hymes put it, "[N]ever tell on nobody." Members gained status or "stripes" by fighting for the gang. If a member failed to fight when duty required, he was subject to punishment by the gang. The St. Paul Rolling 60s were headed by Terron Williams, who dominated the gang from about 1990 until (at least) the time of his arrest for drug crimes in 2001. Terron Williams held regular meetings for the membership, which became so large that they had to be held at a football stadium, where up to 200 people would gather to take instruction about the gang's business and discipline, put money together to buy more

-20-

drugs, and form social relationships. The gang's leadership also had meetings, for which Terron's sister Diane would fix barbeque.

There is overwhelming evidence that the Rolling 60s Crips had continuity of leadership and membership, that the members shared a common purpose of selling drugs, and that they engaged in mutual defense and in collateral instructional, organizational, and social activities to support the gang's business and its continued existence. There was abundant proof that there was an "enterprise" in this case.

(2)

No one challenges the sufficiency of the evidence that the St. Paul Rolling 60s Crips were engaged in racketeering activity, and there is ample evidence that they sold crack cocaine for at least fourteen years.

(3)

The interstate commerce jurisdictional element of § 1959 is contained in the definition of enterprise, which refers to a legal entity or association "which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). There was proof at trial of actual transactions in interstate commerce, including evidence that the cocaine the Rolling 60s sold in St. Paul, up to ten kilos per month, came from Louisiana and California. Terron Williams testified that he obtained the cocaine by sending couriers to fetch it or through the mail. This evidence is sufficient to show that the enterprise was engaged in activities that affected interstate commerce. See United States v. Gray, 137 F.3d 765, 772-73 (4th Cir. 1998) (en banc); United States v. Thomas, 114 F.3d 228, 253 (D. C. Cir. 1997).

Johnson argues that the murder, rather than other activities of the enterprise, must be shown to have affected interstate commerce. This is not what § 1959 says.

-21-

It only requires that the enterprise be engaged in or affect interstate commerce, not that the murder must do so. The murder must, in turn, bear the relationship to the enterprise described in the statute. We conclude below that the murder in this case arose from the defendants' desire to achieve entrance to or greater status within the enterprise. See section II.B.(v), infra. This proof satisfies the requirements for conviction under § 1959. See United States v. Marino, 277 F.3d 11, 35 (1st Cir.), cert. denied, 536 U.S. 948 (2002); United States v. Riddle, 249 F.3d 529, 538 (6th Cir. 2001), cert. denied, 534 U.S. 930 (2001); United States v. Feliciano, 223 F.3d 102, 117-19 (2d Cir. 2001). We dealt with the constitutional argument of whether Congress could enact § 1959 pursuant to its Interstate Commerce power in section I, supra.

(4)

All three defendants argue that there is insufficient evidence to show that they were the people who committed the murder. There are three sorts of evidence connecting the defendants to the murder: the testimony of those who heard them bragging about shooting at the Bogus Boys the night of July 20, 1996; the testimony of Maalik Harut that he drove them to Sherburne Avenue, waited for them there, and then drove them away; and the evidence that Johnson had access to the Heckler and Koch gun that was likely to have been the murder weapon.

All three defendants contend that the failure of the eyewitnesses to identify the defendants in or out of court renders the government's case insufficient. There is no requirement of eyewitness identification to support a conviction. The defendants were able to expose to the jury that the eyewitnesses failed to identify the defendants and that two of the eyewitnesses picked out other people from photo spreads, even though one witness viewed a spread that contained pictures of McGruder and Crenshaw. The government countered with the argument that Anthony Shelby, one of the people identified, was in the hospital at the time of the shooting. The

-22-

government also argued to the jury that Shelby and Michael Odell Johnson, another person picked out of the photo spreads, bore strong resemblences to McGruder. Only the jury could resolve these fact questions and we may not disturb its finding.

Crenshaw and Johnson also stress the testimony of two eyewitnesses, Michael Biebl and Randy Crooms, that the men they saw were 6' or 6'1" tall, whereas Johnson is 5'7". Crenshaw's lawyer also argued to the jury that Crenshaw was "probably five-foot-seven, if that." The government tried to explain Biebl's testimony by pointing out that he saw the shooters as they were standing on something behind the fence. At any rate, we may not reverse a conviction because eyewitnesses estimated the shooters were a height that does not match the height of the defendants. The jury could have concluded that the eyewitnesses were mistaken about the men's height.

Johnson argues that another eyewitness, Erik Saari, told police that the shooters appeared to hold the guns in their right hands, whereas Johnson is left-handed. Saari did not even testify at trial, and the jury apparently did not place importance on his statement as reported by another witness. The government also contends that Biebl said he saw a silver gun with a black grip, and for him to have seen the color of the grip from his vantage point indicates that the shooter holding the Heckler and Koch must have been left-handed. This possible conflict depends on inferences from vague testimony and it was for the jury to choose between the witnesses or to reconcile their stories.

All three defendants argue that the witnesses whose testimony linked them to the crime were biased or had a personal interest in inculpating them. Terron Williams, Greg Hymes, and Maalik Harut all were counting on their assistance to the government in this case to induce the government to plea bargain and to move to reduce their sentences. Diane Williams was sister to Terron Williams and Hymes, and Lavern Christopher was Hymes's fiancee. Each had powerful incentives to inculpate the defendants whether or not the defendants were guilty. The defendants

argued as much throughout the trial, from beginning to end.  Yet, as we have discussed at length in section II.A. above, the fact of the witnesses' bias and self-interest does not make their testimony incredible or unsubstantial as a matter of law. The district court instructed the jury to consider the witnesses' self-interest resulting from plea bargains and their desire to obtain sentence reductions by their testimony. The court also interrupted Harut's testimony to caution the jury: "This gentleman is a snitch."  We are flatly prohibited from discarding their testimony on the grounds of bias and interest alone when the jury has seen fit to accept some or all of it.  <u>See, e.g.</u>, <u>Reeves</u>, 83 F.3d at 206-07; <u>Lopez</u>, 42 F.3d at 466-67.

McGruder also argues that the witnesses' testimony was inconsistent with each other.  The inconsistencies he points out do not go to the heart of their testimony, but are instead minor discrepancies about events some six years before trial or else are subject to an explanation reconciling the inconsistencies.  For instance, he argues that Greg Hymes said Maalik Harut had also shot at the Bogus Boys, but Hymes explained that he merely assumed Harut had been shooting with the others.

Crenshaw also draws our attention to inconsistencies.  First, he points out that Terron Williams, Diane Williams, and Maalik Harut have inconsistent stories about how and where Terron Williams learned that the defendants shot at the Bogus Boys. Terron Williams said he was in the parking lot of the Hanover Townhomes the night of July 20 when the defendants and Harut pulled up and told him about the shooting at the Amoco.  Diane Williams said that at the time the defendants walked into Greg Hymes's apartment at Hanover, Terron Williams was still at Diane's apartment in Woodbury, waiting for a ride.  Diane said she informed Terron about the shooting at a party downtown later that night.  Maalik Harut testified that Terron Williams was present inside Greg Hymes's apartment in Hanover when Harut and the three defendants entered and told of the shooting.  An inconsistency about how Terron Williams learned of the shooting does not go to the heart of anyone's testimony connecting the defendants to the murder.

-24-

Crenshaw also argues that Harut's testimony about the order and timing in which he drove various places the night of July 20 is impossible, since the various trips he described would have taken too much or too little time to put him at the crucial places at the times he claimed he was there. Again, these discrepancies do not prove that Harut could not have been at the Amoco at 10:45, the time of the shooting, and so they provide no basis for reversing the conviction.

Crenshaw also contends that testimony of Terron Williams's wife, Twana, shows signs of having been concocted. It is enough to say that the convictions do not depend on Twana Williams's testimony, since Twana did not claim to have heard any admissions by the defendants.

The defendants do point out three inconsistencies that are not collateral, but go directly to defendants' guilt for murder in aid of racketeering activity. First, Maalik Harut testified before the grand jury that he did not believe Johnson had a gun the night of July 20 and that he did not see guns that night. At trial, Harut said Johnson did have a gun that night. Second, on August 23, 2001, when he was arrested for drug dealing, Terron Williams told police that Johnson was not a member of the Rolling 60s in 1996. At trial, Terron Williams said Johnson was a member in 1996. Third, Diane Williams and Lavern Christopher both told police in 1997 that two men came to the Hanover apartments and bragged about a shooting; they did not mention Johnson's name at that time. At trial, of course, both women said four men came to the apartment and one was Johnson.

The testimony at trial on each of the points at issue is corroborated by evidence other than the testimony of the witness who made an inconsistent statement. First, there is evidence other than Harut's testimony that Johnson did have a gun on July 20. Testimony of the government's firearms expert Kurt Moline, gave rise to a reasonable inference that the bullet that killed Davisha Gillum was fired from a Heckler and Koch .38 caliber. Patricia Banks testified that she had such a gun, that Johnson had

-25-

access to it, and that it disappeared from her apartment sometime in 1996. One of the eyewitnesses to the shooting said one of the shooters had a silver gun with a black handle. Banks's gun was silver with a black handle grip. At least two guns were fired at the Amoco, and several witnesses said they heard McGruder complain that his gun had jammed. Terron Williams, Diane Williams, Gregory Hymes and Lavern Christopher all testified that Johnson bragged about having shot at the Bogus Boys. Johnson's lawyer cross-examined Harut about the inconsistency in his statements about whether Johnson had a gun, and the lawyer argued the point in closing, thus highlighting it for the jury twice.

Second, Harut corroborated Terron Williams's testimony that Johnson was a member of the Rolling 60s. Moreover, on scrutiny, the alleged inconsistency is not about whether Johnson was associated with the Rolling 60s, but only about his status within the gang. Johnson's lawyer cross-examined Harut and Williams about whether Johnson was a "wannabe" or a full member. Their apparent admission that Johnson was a "wannabe" is not inconsistent with the conclusion that Johnson was shooting at Bogus Boys in obedience to Williams's "shoot on sight" order.

Third, Diane Williams and Lavern Christopher's story that four men, rather than two men, came to the Hanover Apartments bragging about shooting the Bogus Boys is corroborated by abundant evidence that three men participated in the shooting and one drove get-away. Michael Biebl said he saw three men participate in the shooting. Randy Crooms said he saw three people running between houses to get to the car waiting for them on Sherburne, and the three were tucking guns into their waistbands. Crooms said that when the three got in the passenger side and back seats, the car took off. Harut said that Johnson was in his car that night and that Johnson ran through the yards to the Amoco station and, after the gunshots sounded, returned with the others. Johnson's lawyer brought out on cross-examination and in closing that Diane Williams and Lavern Christopher had first told police only two people came to the apartment bragging. Johnson's lawyer also made the point on closing that

none of Terron Williams's family mentioned Johnson as having been involved until after Terron Williams had been arrested.

In sum, each of the three assertions that was the subject of inconsistent earlier statements was corroborated by other evidence and was pointed out to the jury. One of the claimed inconsistencies, about whether Johnson was a full member or a "wannabe," was not crucial to a determination of guilt. Accordingly, the inconsistencies give us no warrant to disturb the jury's verdict.

Finally, we observe that this is not a case like United States v. Waterman, 704 F.2d 1014, 1017 (8th Cir. 1983), in which the conviction hinged solely on evidence of the defendants' out-of-court admissions to another. These convictions are supported by the testimony of Harut, the get-away driver, that he and the defendants were driving around looking for Bogus Boys, that they found Bogus Boys at the Amoco station, that Harut pulled around the corner and let the defendants out, that gunshots resounded, and that the defendants came running back to the car. Also helping to establish identity of the shooters was the evidence tending to link Johnson to the Heckler and Koch .38 caliber.

There was sufficient evidence of the identity of the shooters to sustain the jury's verdict.

(5)

The defendants contend that there was not sufficient evidence that they committed the murder with the intent requisite under § 1959. Section 1959 covers violent crimes committed either in hope of pecuniary gain from an enterprise or for the purpose of achieving acceptance or promotion within the enterprise.

There was a great deal of general testimony that fighting the Rolling 60s enemies was a way of achieving acceptance and status within an extremely

-27-

hierarchical organization.  Members gained "stripes" by fighting for the gang, and everyone was expected to participate in avenging injuries to other Rolling 60s members.  Failure to stand and fight led to discipline or expulsion.

There was also particular testimony that the Rolling 60s rank and file had been ordered to carry out a war against the Bogus Boys.  The Bogus Boys were moving in on Rolling 60s territory.  The Bogus Boys had stolen Terron Williams's cars and had shot at him in his yard.  In the summer of 1996, the problem with the Bogus Boys was discussed at the Rolling 60s meetings, and Terron Williams had issued a "shoot on sight" order.

Williams testified that Johnson and McGruder were members of the Rolling 60s and that Crenshaw had previously been a member of two other gangs, but had begun associating with the Rolling 60s after becoming acquainted with a Rolling 60s "OG," Roosevelt Sanders.

Maalik Harut said that on the night of the shooting, he and the defendants were driving around looking for Bogus Boys.  Harut said all three defendants had guns.  When they saw two cars full of Bogus Boys at the Amoco, Harut let the defendants out of the car on a street behind the station, and they ran through yards toward the station.  The blue Cadillac in which Davisha Gillum sat was driven by the girlfriend of a Bogus Boy, and the shooters rained a barrage of fire at the car, not only killing Davisha, but wounding her mother and another woman.  There were six bullet holes in the car, one bullet in the trunk, and the seventh bullet, which killed Davisha Gillum, had to have gone in the window.

Moreover, as soon as the shooting was over, the defendants reported the shooting, with apparent elation, to the Rolling 60s hierarchy, Terron Williams and Greg Hymes.  This supports the inference that the defendants were seeking to gain status by committing acts of violence against their gang's enemies.

-28-

There was ample evidence from which a jury could infer that, if Crenshaw, Johnson and McGruder were the shooters, they shot with intent to gain status or admission in the Rolling 60s.

## III.

Johnson argues that the district court erred in denying his motion for a new trial on the ground that the verdict was against the weight of the evidence. We review the district court's denial of a new trial for abuse of discretion. United States v. Placensia, 352 F.3d 1157, 1162 (8th Cir. 2003). The standard for granting a new trial is not as stringent as that for granting acquittal on the ground of insufficiency of evidence. United States v. Williams, 340 F.3d 563, 571 (8th Cir. 2003). The district court need not view the evidence in the light most favorable to the government in considering a new trial motion. United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). A district court may not grant a new trial unless the evidence "weighs heavily enough against the verdict that a miscarriage of justice may have occurred." Placensia, 352 F.3d at 1162 (internal quotation marks omitted); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980) ("serious miscarriage of justice"). "Motions for new trials based on the weight of the evidence are generally disfavored." Campos, 306 F.3d at 579. The district court's authority to grant a new trial should be exercised "sparingly and with caution." Id. (internal quotation marks omitted).

We have examined the evidence scrupulously in addressing Johnson's argument that the evidence was insufficient. In particular, we have scrutinized the evidence of the identity of the shooters. We acknowledge that the only physical evidence, that concerning the Heckler and Koch pistol, does not definitively tie Johnson to the crime, since the testimony established only a probability that a Heckler and Koch was used in the shooting and there was only circumstantial evidence that Johnson had the gun that night. The other evidence linking Johnson to the crime was

-29-

the testimony of witnesses who had reasons of self-interest for inculpating Johnson and the other defendants. Further, of those witnesses, at least Maalik Harut and Terron Williams were criminally responsible for the murder. Lavern Christopher and Diane Williams initially told police that they heard only two people confess to the crime, neither of whom was Johnson. Moreover, all of the witnesses who inculpated Johnson have shown a willingness to lie. Nevertheless, the district court, not we, viewed the testimony, and it denied the motion. See Ortega v. United States, 270 F.3d 540, 547 (8th Cir. 2001) (district court is in best position to determine whether verdict is against the weight of the evidence). Notwithstanding all the weaknesses that we have explored, there was a considerable amount of evidence that, if believed, connected Johnson to the crime. We cannot say that the district court abused its discretion in concluding that Johnson was not entitled to a new trial.

IV.

Crenshaw argues the district court erred in admitting evidence of two of his prior convictions, a 1994 conviction for reckless endangerment with a firearm and a 1995 conviction for second-degree assault.

Evidence of the prior crimes was admitted on two separate occasions during the trial. First, immediately prior to the conclusion of the government's case, the government offered as an exhibit a certified copy of Crenshaw's 1995 guilty plea to the second-degree assault charge. Second, during the cross-examination of Crenshaw's primary alibi witness, Twanda McCoy, the government was permitted to ask questions about both the 1994 and 1995 convictions. Crenshaw's counsel objected on both occasions.

The government argues that the 1995 conviction is relevant to Crenshaw's motive or intent in committing the alleged acts in this case and therefore relevant under Rule 404(b) of the Federal Rules of Evidence. Alternatively, the government

contends that the questions posed to McCoy about the 1994 and 1995 convictions were proper for showing her bias by demonstrating that she had stayed loyal to Crenshaw despite his numerous acts of violence.[5] At trial, the district court relied on Fed.R.Evid. 611 in admitting this line of cross-examination; however, the district court's Rule 611 ruling was apparently influenced by the fact that the evidence of the 1995 conviction had already been admitted under Rule 404(b).

## A.

We will first consider the admissibility of the prior crimes evidence under Rule 404(b). We review a district court's decision to admit evidence under Rule 404(b) for abuse of discretion. See United States v. LeCompte, 99 F.3d 274, 277 (8th Cir. 1996). While we have interpreted Rule 404(b) to be a rule of inclusion, see United States v. Sykes, 977 F.2d 1242, 1246 (8th Cir. 1992), this interpretation does not give the government the unhindered ability to introduce evidence of prior crimes. Instead, the evidence of prior crimes must be 1) relevant to a material issue; 2) similar in kind and not overly remote in time to the charged crime; 3) supported by sufficient evidence; and 4) such that its potential prejudice does not substantially outweigh its probative value. See United States v. Williams, 308 F.3d 833, 837 (8th Cir. 2002).

The district court never clearly articulated the basis upon which it admitted the certified copy of Crenshaw's 1995 conviction during the government's case-in-chief.

---

[5]The government's brief also suggests that the district court gave the government particular latitude in the cross-examination of McCoy because Crenshaw improperly failed to provide notice of an earlier alibi witness, Dawn Johnson. In essence, the government appears to be implying that the district court bent the rules of evidence with respect to the cross-examination of McCoy simply because Crenshaw's counsel failed to follow the rules of criminal procedure with respect to a different witness. There is no indication in the record that the district court had such a retaliatory motive in mind when deciding to allow questioning on the prior crimes.

Before trial, the government had offered a variety of hypothetical uses under Rule 404(b) for this evidence, but gave no concrete reason for admission. The district court appropriately reserved its ruling on admissibility until the government actually tried to introduce the evidence at trial. The district court also informed the government that, before using the evidence at trial, it would need to identify a basis under Rule 404(b). At trial, the government successfully introduced evidence of Crenshaw's *incarceration* for the 1995 conviction during the testimony of one of its witnesses, Sergeant Thomas Dunaski, stating that the evidence was necessary to show that Crenshaw became close to Roosevelt Sanders, a Rolling 60s member, while they were in prison together. However, the government agreed to some limitation on its use of this evidence[6] and did not attempt to introduce the conviction itself during the

---

[6]During Dunaski's direct examination, the government attempted to introduce a status report from the Minnesota Department of Corrections regarding Crenshaw's incarceration in a Faribault, Minnesota, prison. Crenshaw's counsel objected, and the district court engaged in the following exchange with Crenshaw's counsel (Ostgard) and the government attorney (Paulsen):

> MR. OSTGARD: Your Honor, there's some extraneous information on this particular status history report indicating fugitive information, and other kinds of information.
>
> THE COURT: What do you need it for?
>
> MR. PAULSEN: Well, if I can just put the dates in, I'm trying to show overlap between Crenshaw and Roosevelt Sanders. There's testimony–
>
> THE COURT: That they hooked up in jail?
>
> MR. PAULSEN: That they hooked up in jail, and they got out about the same time, and I want to show some verification of that.
>
> MR. OSTGARD: The only objection, your honor, is with respect

examination of Sergeant Dunaski. It was not until the end of the government's case-in-chief that it finally offered a certified copy of the 1995 conviction, to explain "the sentence [Crenshaw] was serving at Faribault just prior to his release."  The district court admitted this evidence over Crenshaw's objection without requiring the government to articulate a reason under Rule 404(b).  On appeal, the government argues that the 1995 conviction is relevant under Rule 404(b) to the issue of motive because Crenshaw met and formed a relationship with Rolling 60s gang member Roosevelt Sanders while serving time for that conviction, and this relationship led to Crenshaw's eventual involvement with the gang.

To the extent the district court admitted the 1995 conviction under Rule 404(b) on the basis of its relevance to Crenshaw's motive, we conclude that the court abused its discretion. We recognize that Crenshaw's incarceration in 1995 is marginally relevant to his motive for committing the alleged acts in this case; indeed, it would be difficult for the government to establish Crenshaw's involvement in the Rolling 60's gang without evidence of the relationship that Crenshaw and Sanders developed while in prison. However, there is a significant difference between admitting evidence of events occurring *during* a defendant's incarceration and admitting evidence of the criminal activity *giving rise* to that incarceration.  The former has some probative value in a case such as this one; the latter seems purely prejudicial. See, e.g., United States v. Robinson, 956 F.2d 1388, 1397 (7th Cir. 1992) (affirming admission of evidence of prior imprisonment when used to explain defendant's motive in selling cocaine, explaining, "The chance that the evidence would unfairly prejudice [defendant] was sufficiently reduced because the government did not

to extraneous information here.

MR. PAULSEN: Why don't I cover that and then I'll move on.

THE COURT: That will be fine.  Okay.

-33-

introduce evidence of the conduct underlying the sentence of imprisonment."); <u>United States v. Mauro</u>, 80 F.3d 73 (2nd Cir. 1996) (affirming admission of evidence that witness met defendant while both were in jail where "[t]he court permitted the government only to reveal that Mauro was in prison, and not the reason for his incarceration").

The government makes a more compelling argument when it contends that the prior convictions are relevant under Rule 404(b) to Crenshaw's intent in committing the murder alleged here. We pause, however, to note that nothing from the government's conduct at trial or in the extensive pretrial motions hearings gives even the slightest indication that it actually used or considered using the earlier convictions to show intent. The government did not even mention intent in its brief to this court, instead raising it for the first time during oral argument. Similarly, it does not appear that the district court considered intent in deciding to admit the evidence under Rule 404(b).[7] Nonetheless, we may affirm the admission of evidence under Rule 404(b)

---

[7]The following exchange regarding the use of Crenshaw's prior convictions (as well as certain other 404(b) evidence) occurred during the final day of jury selection:

THE COURT: If you were to offer it under 404(b), which, if any, of the elements would you be offering it under?

MR. PAULSEN: Oh, well, let me say this: that I'm kind of guessing at what the defenses were going to be here, and I wasn't intending to talk about these prior convictions in my opening statement; but if the defense is, "My guy is a peace-loving guy. He hates guns. He doesn't go near guns. He's a nonviolent guy," then I think it certainly is relevant to show in the case of Mr. Crenshaw, for example, that you shot people at close range twice in the past. One of them was a drive-by, and another was a dice game or something. Maybe it won't come to that. But I give them notice so that everybody knows that that's out there.

THE COURT: It seems to me under the rule and the way the Eighth

Circuit construes it, you'll be talking about motive, opportunity, common scheme or plan, preparation, absence of a stake (sic), things along that nature, and you usually will be required to let us know which of those you intend to use. Right now, I think you're telling me you put them out as a prophylactic.

MR. PAULSEN: I did, and–

THE COURT: As well as it may go to the substantive proof of whether or not this is, in fact, an illegal enterprise.
     And at this moment, before you introduce the 404(b) evidence, I will direct that you come to sidebar and before you refer to it, that you do the same in front of the jury. You will, of course, if it is offered under 404(b), be required to identify the basis for that claim.

At trial, before the government had attempted to introduce the evidence of Crenshaw's prior crimes, Crenshaw's counsel submitted a memorandum reiterating his concerns about the use of such evidence. The court again questioned the government about its proposed use of the evidence:

THE COURT: Mr. Paulsen, on what basis under 404(b) is [Crenshaw's prior crimes] evidence admissible, if it's admissible at all?

MR. PAULSEN: Your Honor, what I'd like to do is – I just got this memo. I haven't even had a chance to read it yet. But I have been thinking about these issues, and I want to alert the court that I'd like to think about it some more before I decide whether to offer that.

THE COURT: All right. On that basis, then, you'll refrain, unless you notify the court?

MR. PAULSEN: Absolutely.

on a ground that the district court itself did not explicitly consider. See United States v. Mothershed, 859 F.2d 585, 589 (8th Cir. 1988) ("If no particular issue is articulated as the basis for the relevancy of the prior-bad-act evidence, the reviewing court is left with the burden of reconstructing all of the material issues from trial and determining whether the evidence is relevant to any of them."). Thus, we will consider the government's post hoc attempt to justify the admission of the 1995 conviction based on its relevance to Crenshaw's intent.

Crenshaw's plea of not guilty put every element of the crime of murder in aid of racketeering activity at issue, including, as the district court instructed the jury, whether he acted "with an intent to effect the death of the person or another." Crenshaw's 1995 conviction is relevant to intent because it helps to demonstrate that his use of firearms was accompanied by the intent to inflict serious bodily harm or death on his victims. See United States v. Haukaas, 172 F.3d 542, 544 (8th Cir. 1999) (no abuse of discretion for district court in defendant's trial for allegedly assaulting two passengers in automobile with a knife to admit testimony from defendant's girlfriend that he had attacked her with a knife two years earlier); United States v. Weddell, 890 F.2d 106, 108 (8th Cir. 1989) (district court did not abuse its discretion in admitting testimony about defendant convicted of voluntary manslaughter's previous use of knives where "defendant's penchant for using knives was relevant to his intent with respect to his use of the knife against [victim]").

This court has often stated that "we will overturn the admission of Rule 404(b) evidence only if the appellant can show that the evidence in question clearly had no bearing upon any of the issues involved." United States v. Warfield, 97 F.3d 1014, 1026 (8th Cir. 1996) (quoting United States v. Baker, 82 F.3d 273, 276 (8th Cir.

_____

Despite these discussions, the district court at trial simply allowed (over objection) the admission of the 1995 conviction without requiring the government to explain its Rule 404(b) relevance.

1996) (quoting United States v. Street, 66 F.3d 969, 976 (8th Cir. 1995))); accord United States v. Callaway, 938 F.2d 907, 910 (8th Cir. 1991). Considered alone, this language suggests that our conclusion of the relevance of the 1995 conviction is sufficient by itself to affirm the admission of that conviction without regard to the other parts of the four-part test for admissibility under Rule 404(b). In this respect, the quoted language is somewhat misleading. The test has four parts, not one. See, e.g., Warfield, 97 F.3d at 1026 (reciting four-part test and considering the similarity and prejudice of the challenged evidence in addition to its relevance); Baker, 82 F.3d at 276 (reciting four-part test and considering prejudice and remoteness in time in addition to relevance); Callaway, 938 F.2d at 910 (carefully applying four-part test). Indeed, it would make little sense to recite a four-part test under Rule 404(b) if our review of the admissibility of prior crimes evidence was governed solely by its relevance. Thus, even though we conclude that Crenshaw's 1995 conviction is relevant to intent, we still must consider whether the evidence is similar in kind and not overly remote in time, supported by sufficient evidence, and has probative value which is not substantially outweighed by its prejudicial effect.

The 1995 conviction is similar in kind and not overly remote in time to the alleged offense here. Both incidents involved Crenshaw's use of a firearm for the purpose of harming another person. See Haukaas, 172 F.2d at 544; Weddell, 890 F.2d at 108. The two acts occurred within two years of each other, which in light of all the circumstances does not seem overly remote in time. The 1995 conviction also is supported by sufficient evidence, as it was obtained by Crenshaw's guilty plea and introduced in the form of a certified copy of the judgment.

The difficult issue is whether the potential prejudice of the 1995 conviction substantially outweighs its probative value. During a trial where Crenshaw was accused of murdering someone with a firearm, the 1995 conviction showed that Crenshaw had previously been convicted of shooting a man. Certainly a juror might use the similarity of the earlier crime to draw a conclusion about Crenshaw's guilt in

the instant case. The potential prejudice was magnified by the government's repeated and often graphic references to the conviction during the trial. When the government introduced the certified copy of the 1995 conviction, it explained that the incident "involv[ed] shooting an individual with a firearm four times." During the cross-examination of Twanda McCoy, Crenshaw's primary alibi witness, the government asked, "your fiancé, Mr. Crenshaw, has shot people before, hasn't he?"; asked virtually the same question following an objection by the defense; noted that "when [Crenshaw] plead guilty, under oath, he admitted that he shot the guy four times in the stomach"; and asked McCoy if she "stuck with [Crenshaw] through the jail time he did for that second shooting, where he shot the guy in the stomach four times?" During closing argument, the government again mentioned that Crenshaw's 1995 conviction was a "[f]elony conviction for shooting someone four times in the stomach." See, e.g., Mothershed, 859 F.2d at 590 (holding that district court committed reversible error in prosecution for bank robbery in admitting evidence of the defendant's ten-year-old conviction of possessing stolen funds where there would be a "devastatingly prejudicial impact of such evidence in the minds of the jury"); cf. Old Chief v. United States, 519 U.S. 172, 185 (1997) (recognizing that the risk of unfair prejudice "will be substantial whenever the official record offered by the Government would be arresting enough to lure a juror into a sequence of bad character reasoning").

On the other hand, the probative value of the 1995 conviction in proving the only issue to which we find it relevant – intent – is limited in the circumstances of this case. As we noted above, the government never mentioned intent as a possible basis for admitting the evidence under Rule 404(b) until oral argument before this court, long after the trial had ended. The government's actual use of the evidence at trial does nothing to persuade us that it even considered the earlier conviction as relevant to intent; instead, it used the evidence primarily during what was ostensibly an attack on McCoy's credibility. Thus, the jury never learned from the government that the 1995 conviction had any relevance to the issue of intent. Similarly, the

elaborate instruction given by the district court to the jury regarding the proper use of prior crimes evidence noticeably fails to mention intent: "[Y]ou can use this [prior bad acts] evidence to decide particular questions of that particular defendant's common scheme, their plan, their motive, their knowledge, issues in that regard." In fact, intent was not even disputed at trial. Crenshaw's defense was that he was not present during the shooting, not that he shot without intent to kill.

In sum, we conclude that the prejudicial effect of the 1995 conviction substantially outweighs its probative value on the issue of Crenshaw's intent. Thus, the district court abused its discretion in admitting this evidence under Rule 404(b), which requires us to consider whether the admission of this evidence is harmless error (see II.(C)).

## B.

The government argues that there is an alternative basis upon which to justify admission of the 1995 conviction. McCoy provided a comprehensive alibi for Crenshaw during her direct testimony, explaining that she had been with him at all relevant times during the night of the shooting. On cross-examination, the government asked McCoy several questions about the details of Crenshaw's 1994 conviction for reckless endangerment with a firearm and 1995 conviction for second-degree assault. The government argues that this use of the prior crimes evidence was proper for demonstrating McCoy's credibility and bias because it showed "that McCoy was so loyal to Crenshaw that she stayed with him through thick and thin."

Fed. R. Evid. 611(b) states: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." As the rule makes clear, we give broad deference to the district court's determination of the appropriate scope of cross-

examination. See United States v. Schepp, 746 F.2d 406, 410 (8th Cir. 1984). However, district courts must exercise their discretion under Rule 611 in a manner that ensures the exclusion of unfairly prejudicial evidence. See United States v. Maddix, 96 F.3d 311, 315 (8th Cir. 1996) (considering whether evidence raised on cross-examination was unfairly prejudicial).

McCoy was not a character witness for Crenshaw, nor was Crenshaw's character otherwise put into issue at trial. The government's brief suggests that the scope of McCoy's direct examination went beyond simple alibi testimony and actually represented character evidence because McCoy's testimony "strove to portray Crenshaw as a gentle, caring person who did nothing more than take his family to Rondo Days on the day in question . . . ." However, an alibi witness does not become a character witness simply because her factual testimony has the incidental effect of providing insight into the defendant's character. Cf. United States v. Gilliland, 586 F.2d 1384, 1389 (10th Cir. 1978) ("The government may not turn [an alibi witness] into a character witness by asking him what kind of a man defendant was, and then use those questions to bootstrap into the case evidence of defendant's prior convictions which it was prohibited from using in its case-in-chief."). The fact that McCoy discussed Crenshaw's interaction with his family in her description of the events of that day does not give the government an open door to inquire about his character on cross-examination. Thus, the government cannot justify the admission of the prior crimes evidence on the ground that the issue of Crenshaw's character had been raised.

We have little trouble concluding that it was an abuse of discretion to admit the evidence of Crenshaw's prior crimes for the purpose of attacking the credibility of an alibi witness who had no connection to the crimes except for a romantic relationship with the defendant at the time they occurred. Regardless of whether staying with Crenshaw despite his violent criminal background has any usefulness in demonstrating McCoy's bias, the government's rationale is undermined by McCoy's

-40-

unchallenged testimony on cross-examination that she was *not* romantically involved with Crenshaw at the time of his 1995 conviction. Moreover, the government had plenty of other evidence available to attack McCoy's credibility. First, McCoy's relationship with Crenshaw at the time of this trial–she was his fiancee and the mother of his child–speaks for itself in illustrating her bias. Second, the government established on cross-examination that McCoy had provided an alibi for Crenshaw in an earlier drunk driving proceeding, and the cross-examination of McCoy cast serious doubt on her truthfulness in that proceeding. It is difficult to see how the 1994 and 1995 convictions could have done any more to call her credibility into question. See United States v. Southwest Bus Sales, Inc., 20 F.3d 1449, 1457 (8th Cir. 1994) ("If [prior bad acts] evidence is cumulative, the trial court should more closely scrutinize its prejudicial effect") (quoting United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 530-32 (4th Cir. 1985)); United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) ("Doubts about the probative value of prior bad acts evidence are thus compounded when prosecutors have other evidence available [to prove the same point]. . . .") (internal citation omitted).

Even if the government had no other evidence available to attack McCoy's credibility, we doubt evidence of Crenshaw's prior crimes would be appropriate. Our review of relevant case law reveals the government's use of Crenshaw's prior crimes evidence during the cross-examination of McCoy to be an unprecedented attempt to circumvent the rule that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b); see also United States v. Forcelle, 86 F.3d 838, 841 (8th Cir. 1996) ("In general, evidence of crimes by the defendant, not charged in the indictment, are not admissible."). We can find no reported cases where the prosecution even attempted to introduce evidence of a defendant's prior convictions to show the bias of a "loyal" witness, nor does the government cite any instances where a court actually upheld such a rationale. Indeed, a defendant would be reluctant to ever put a witness on the stand if the government could introduce

otherwise impermissible evidence of the defendant's prior bad acts in order to show the witness's bias. In this regard, we share the concern expressed by the First Circuit in Varoudakis, 233 F.3d at 125:

> Despite the fairness implications of the prosecution's use of prior bad act evidence, the prosecution too often pushes the limits of admissibility of this evidence, knowing its propensity power and gambling that the time constraints on the trial court, the court's broad discretion, the elasticity of Rule 404(b), and the harmless error rule of the appellate court, will save it from the consequences of overreaching. That is not always a good gamble.

We conclude that the district court's admission of the prior crimes evidence cannot be sustained under either Rule 404(b) or 611 unless this error was harmless.

## C.

An evidentiary error is harmless "if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000). In determining whether an evidentiary error was harmless, we must consider the effect of the improper evidence in the overall context of the government's case. Id.

Although the evidence against Crenshaw was far from overwhelming, we do not believe the improper evidence of Crenshaw's prior convictions had any more than a slight influence on the jury. Several of Crenshaw's prior bad acts had already (properly) been admitted into evidence, including a drunk driving incident in 1993 and evidence of his involvement with multiple gangs during a several year period before this particular murder. Moreover, as an unavoidable consequence of prosecution under 18 U.S.C. § 1959, the subject of the Rolling 60's violent and illegal

activities was explored in great detail throughout the trial. Thus, there was little likelihood that Crenshaw's 1994 and 1995 convictions would lure the jury into a sequence of bad character reasoning that it would not otherwise have engaged.

It also does not appear that the improper evidence of Crenshaw's prior crimes infected the entire trial to the extent described in the few other cases where we have reversed on the basis of improperly admitted evidence of prior crimes. See United States v. Forcelle, 86 F.3d 838, 843 (8th Cir. 1996) (reversing defendant's conviction on various fraud charges because of improper admission of evidence that defendant had stolen platinum from his employer); United States v. Roark, 924 F.2d 1426, 1432-34 (8th Cir. 1991) (reversing conviction of member of Hells Angels' motorcycle gang on drug conspiracy charges based on improper evidence of the gang's activities). In Forcelle, we reversed because over 900 pages of the nearly 2000 page trial transcript dealt with improper evidence of the platinum allegations. 86 F.3d at 843. Similarly, we reversed in Roark because the evidence of the unlawful activity of the defendant's gang was so pervasive, "the jury could not disregard the entire theme of the trial: guilty by association." 924 F.2d at 1434. By contrast, the references to Crenshaw's prior convictions were at least relatively isolated and represented only a very small part of the government's overall case.

Finally, the district court gave an appropriate and comprehensive limiting instruction to the jury. The court stated, for example: "You may not, of course, convict a person simply because you believe he may have committed other or similar acts in the past. The defendants are only on trial for the crime charged in the indictment, and you may consider then the evidence of prior acts, only as I have instructed you." We recognize that there are some cases where the admission of a defendant's prior bad acts cannot be cured by any limiting instruction. See, e.g., United States v. Mothershed, 859 F.2d 585, 591-92 (8th Cir. 1988) (reversible error for district court to admit evidence of defendant's conviction from ten years earlier despite limiting instruction from the district court both at the time the evidence was

introduced and during the jury instructions). In light of the overall circumstances of this trial, however, we conclude that the instruction was adequate to ensure that the jury did not place undue weight on Crenshaw's prior convictions.

## V.

McGruder argues that the district court erred in refusing to disclose the identity of a confidential informant who was said in a police report to have overheard Terron Williams speak to another gang leader about the identity of the shooters at the Amoco station. We review the district court's refusal to require disclosure of the identity of a confidential informant for abuse of discretion. United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998). The defendant has the burden of showing that the need for disclosure outweighs the government's privilege to withhold the identity of its confidential informants. United States v. Fairchild, 122 F.3d 605, 609 (8th Cir. 1997). The defendant can meet his burden by showing that disclosure is relevant and helpful to his defense, or essential to a fair trial. United States v. Lapsley, 263 F.3d 839, 841 (8th Cir. 2001). However, "[i]t is well established that in 'tipster' cases, where the informant is not a necessary witness to the facts, disclosure of the informant is not required." United States v. Moore, 129 F.3d 989, 992 (8th Cir. 1997).

We conclude that the district court did not abuse its discretion in denying McGruder's motion. McGruder contends that the informant's testimony might have been helpful in refuting Williams' trial testimony because Williams allegedly did not mention McGruder's name when identifying the shooters to the other gang leader even though he did name McGruder at trial. Regardless of the substance of the conversation overheard by the informant, it is clear that the informant had no first-hand knowledge of the events surrounding the shooting and was therefore not a necessary witness to the facts. Thus, the district court did not abuse its discretion in denying McGruder's motion for disclosure of the informant's identity. See Moore,

129 F.3d at 992 (district court did not abuse discretion in refusing to disclose identity of confidential informant who did not witness or participate in the actual offense); United States v. Hollis, 245 F.3d 671, 674 (8th Cir. 2001) (holding that government was not obligated to disclose informant's identity where the confidential informant did not participate in the offense charged or testify at trial).

VI.

In sum, we reject the defendants' various challenges and affirm the judgments of conviction and sentences imposed by the district court on Crenshaw, Johnson, and McGruder.

_____